**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**LINDA ALLEN,**

   **Plaintiff,**

**v.**                                    **No. 14-CV-00059 JCH/RHS**

**THE CITY OF ALBUQUERQUE,
MAYOR RICHARD J. BERRY,
in his official capacity as Mayor of Albuquerque,**

   **Defendants.**

**RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

   COMES NOW the Plaintiff, by and through her counsel of record, Christopher N. Orton, and hereby responds to the Defendant's Motion for Summary Judgment.

**CAUSES OF ACTION**

   Defendant's brought a summary judgment motion on Plaintiff's complaint concerning, Count I Race Discrimination under 42 U.S.C. § 1981, Count II Equal Protection under 42 U.S.C. § 1983, Count III Breach of Contract and Count IV Violation of title VII – RETALIATION stemming out of her employment with the Defendant.

**DISPUTED FACTS**

Plaintiff disputes the following facts,

1.   Plaintiff disputes Defendant's fact number 3.  As Plaintiff was transferred in 2006 from being an E-14 to being an M-14 employee.  This had the effect of lowering her pay. (See Plaintiff's Exhibit 20).

2.   Plaintiff disputes Defendant's fact number 9 as inaccurate in that Defendant is stating the Plaintiff was the only person allowed to work a flexible schedule. In Defendant's

Exhibit F, Mrs. Yara testifies about a number of people who were on a flex schedule at that time (Defendant's Exhibit F Pages 38, 39, 40 and 41).

3.  Plaintiff disputes Defendant's fact number 13 as inaccurate.  In the email the Plaintiff did not refuse to turn in a P-30 and that was not the basis for the meeting.  As stated in the email, the Plaintiff refused to turn in the P-30 at that moment and would turn it in after a phone call.  (Defendant's Exhibit L).

4.  Plaintiff disputes Defendant's fact number 15 as inaccurate. Supervisor Yara asked the Plaintiff to change her hours.  As Mrs. Yara was Plaintiff's direct supervisor this had the effect of requiring the Plaintiff to work the 8:00 a.m. to 5:00 p.m. hours. (Defendant's Exhibit F, Page 40, lines 16-18).

5.  Plaintiff disputes Defendant's fact number 20 as inaccurate.  Plaintiff's classification was changed from a non-bargaining E series to a Bargaining M series.  Under the City regulations a person who is moved to an M position must be listed at an M step that had the next highest pay.  The Cities E and M series are listed at different hourly pay levels and therefore the transfer should not be considered a raise as the Defendant placed the Plaintiff in the next assigned M-15 Step 3 level. (Plaintiff's Exhibits 9, 10 and 11).

6.  Plaintiff disputes the Defendant's fact number 21 as inaccurate.  The letter of instruction does not contain the word draft and Mr. Muniz wrote in a subsequent email that he met with the Plaintiff to give her the letter of instruction.  As this letter was going to be given to the Plaintiff it was not a draft. (Plaintiff's Exhibits 12 and 13).

7.  Plaintiff disputes Defendant's facts number 23 and 24 for the same reason as fact number 21. The letter of instruction does not contain the word draft and Mr. Muniz wrote in a subsequent email that he met with the Plaintiff to give her the letter of

instruction.  As this letter was going to be given to the Plaintiff it was not a draft. (Plaintiff's Exhibits 12 and 13).

8.   Plaintiff disputes the Defendant's fact number 33 as being inaccurate.  Although the Department of Justice originally mailed a right to Sue letter to the Plaintiff.  It was returned as undelivered/unclaimed.  The Department of Justice then sent a second Right to Sue letter on April 24, 2013 to the Plaintiff's Attorney's old address of 118 Wellesley.  The Plaintiff's attorney has not been at the 118 Wellesley address since May 2010 and any forwarding orders had expired in 2011.  Because of this the Department of Justice sent out a third right to Sue letter on August 20, 2013.  The Plaintiff and Plaintiff's Attorney did not receive the Department of Justice's Right to Sue letter until sometime after August 20, 2013 making the October 1, 2013 filing of the complaint timely. (Plaintiff's Exhibit 22).

9.   Plaintiff disputes Defendant's fact number 36 as it is based upon Defendant's Exhibit II which is an unsigned, non-notarized, hand written document that Plaintiff has no ability to know who it is from or who wrote it. (Defendant's Exhibit II).

10.  Plaintiff disputes Defendant's fact number 41 as it is based upon Defendant's Exhibit NN which is a blurry uncertified photo and an unsigned, non-notarized, hand written document that Plaintiff has no ability to know who it is from or who wrote it. (Defendant's Exhibit NN).

## **PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS**

1. On November 27, 2006, Plaintiff was involuntarily transferred to the Defendant's Accounting Division of the Department of Finance & Administrative Services (DFAS).  Plaintiff was told by Tanda Meadors the DFAS Director that the Plaintiff was going to be brought into the department as the Special Assessment District and Accounts Receivable (SAD-A/R) Supervisor

classified as an M series Fiscal Analyst.  Soon after Plaintiff's position title was changed to her being an E series Fiscal Analyst.  (Plaintiff Exhibit 20)

2.  When Plaintiff took over the SAD-A/R Supervisor position she supervised four (4) Financial Technician clerical employees.  Two (2) were in the SAD Department and two (2) were in A/R department.  (Plaintiff's Exhibit 19 and 20)

3.  In April 2007, Tanda Meadors started assigning the Plaintiff job duties that were outside of her job duties including putting together the write-off report to be presented to City Council and investigating using outside collection agencies to collect past due debt for the City of Albuquerque. (Plaintiff's Exhibit 20)

4.  In the later part of 2007, Tanda Meadors hired Stephanie Yara to be the Plaintiff's new supervisor (Defendant's Exhibit F)

5.  From the beginning of Yara's supervision, the Plaintiff started noticing that Mrs. Yara began treating her differently than the other non-African American supervisors.  (Plaintiff's Exhibit 20)

6.  The first incident was in September 2007, when one of the Plaintiff's clerks Lupe Gallegos got a promotion to the police department (APD).  The Plaintiff asked for a temporary employee to help with the extra work, but Mrs. Yara denied the request.  (Plaintiff's Exhibit 19)

7.  In November 2007 the Plaintiff received her first job evaluation that had been prepared by her former supervisor Greg Stricklin.  Mr. Stricklin was now the Plaintiff's second level supervisor.  In her evaluation the Plaintiff was told she had been evaluated using the E15 and E16 job descriptions because the E-14 Fiscal Analyst job classification did not cover the job duties that she was performing.  Mr. Stricklin also sent the Plaintiff a "Reclassification Form," to complete so her position could be upgraded and she could receive a raise to cover the duties she was performing.  (Plaintiff's Exhibit 20)

8.   At this time Stephanie Yara began micromanaging the Plaintiff's department, this micromanaging included allowing the Plaintiff's staff to go directly to her with their complaints circumventing the chain of command, she allowed one of the Plaintiff's clerks (Loretta) to change her work hours while Plaintiff's other employees with more seniority were not allowed to change their schedule. (Plaintiff's Exhibit 20)

9.   Mrs. Yara also began pulling the Plaintiff's employees from under her supervision to work on spreadsheets for other departments at the beginning of the month.  This was especially damaging to the Plaintiff as the beginning of each month was when they balanced the Accounts Receivable system.  Until the system is balanced and then opened, no one in the City is able to enter Treasury payments.  (Plaintiff's Exhibit 19 and 20)

10.   In December 2007 the Plaintiff was assigned the addition duty of writing a new collections contract.  This included writing a Request for Proposals (RFP), creating the scope of services, and developing the initial procedures and processes for collections at the City.  All of these duties were new as the City had never used an outside agency and it had been more than 10 years since the City had done any kind of collections.  This caused the Plaintiff to work additional hours over her normal 40 hour work week in order to get the work done as her open clerical position had still not been filled and she was not allowed to get a temp employee to help. . (Plaintiff's Exhibit 4)

11.   On January 8, 2008, Mrs. Yara had a meeting with her three supervisors (Laurice Chappell a white female, Gerri Maurino a Hispanic female and the Plaintiff.  At this meeting Mrs. Yara stated that exempt employees including the three supervisors no longer had to turn in timesheets and only had to turn in P30's for absences.  (Plaintiff's Exhibit 20 pages 6 and 7)

12.   In March 2008, Plaintiff's clerk Christa Wagner went out on FMLA leave which left the Plaintiff with only two clerks doing the work that was originally done by four clerks. At that time the Plaintiff once again asked for a replacement but this request was also denied by Mrs. Yara.  (Plaintiff's Exhibit 19 and 20)

13.   In July 2008, Plaintiff lost another of her clerks when the clerk retired.  This caused the Plaintiff to be down by 3 employees.  One who had moved to APD, one who retired and the third employee who was on FMLA and was often out for weeks at a time and was unable to catch up when she would occasionally be in the office. (Plaintiff's Exhibit 19 and 20)

14.   By this time, the Plaintiff was responsible not only for her original Accounts Receivable department and the SAD department, but she now had the additional duties of handling the Collections process for Central Accounts Receivable, overseeing the Collection Contracts for the entire City; cleaning up the past due DAT accounts, creating workable procedures for the DAT and the lien process in the City of Albuquerque, working on the ERP conversion for Accounts Receivable, and cleaning up the current Accounts Receivable system in preparation for an upcoming computer conversion. .  (Plaintiff's Exhibit 4, 19 and 20)

15.   In September 2008, the Plaintiff was informed by her one remaining employee (Francis) that a project the clerk had worked on in her management program was selected by the Mayor's office as a pilot program in several departments.  Because of this, the Plaintiff's only full time employee would now be working part time in another department.  (Plaintiff's Exhibit 19 and 20)

16.   At the end of March 2009 the Plaintiff received a certified letter dated March 20, 2009 from the Cindy Jaramillo the head of human Resources ordering her to go on FMLA. (Plaintiff's Exhibit 20)

17.   At that point Mrs. Yara removed all supervisory duties from the Plaintiff.  At that time the Plaintiff went from being a supervisor who managed Accounts Receivable and collection projects and being a part of the PeopleSoft AR module implementation project and many other major projects, to then being assigned to sorting and batching invoices, stuffing envelopes for mailing, and indexing and verifying thousands of invoices and back-up documentation into the computer system.  (Plaintiff's Exhibit 20)

18.   At the same time, Mrs. Yara instructed the Plaintiff that she had to either start punching a time clock or turn in a timesheet.  The other two supervisors under Mrs. Yara (Laurice Chappell a white female, Gerri Maurino a Hispanic female) were not required to punch a time clock or turn in a time sheet.  (Plaintiff's Exhibit 14 Page 44 line 21-25, Page 45 lines 1-25, Page 46 lines 1-25 and Page 47 lines 1-8)

19.   Mrs. Yara also had the Plaintiff start turning in P30's for any time that she was out of the office and she was no longer allowed to make up time while the other two supervisors under Mrs. Yara (Laurice Chappell a white female, Gerri Maurino a Hispanic female) were still allowed to make up time instead of turning in P30s. (Plaintiff's Exhibit 14 Page 45 lines 8-25)

20.   Finally Mrs. Yara informed the Plaintiff that she could no longer work my 7:00 a.m. to 4:00 p.m. schedule and had to work the 8:00 a.m. to 5:00 p.m. (Defendant's Exhibit F Page 40 lines 16-18)

21.   On July 15 2009 Plaintiff went to her Union representative Patty French to complain about the discrimination she was receiving from Supervisor Yara.  (Plaintiff's Exhibit 3)

22.   Mrs. French arranged a meeting with Director Meadors, Greg Stricklin and Stephanie Yara.  At the meeting Plaintiff expressed that she was being discriminated against by Supervisor Yara.  It was decided that the Plaintiff would no longer report to Mrs. Yara, but would report directly to Greg Stricklin.  At that point Mrs. Yara asked the Plaintiff to leave the room.  While the Plaintiff was in an adjacent office, she heard Mrs. Yara say that if they did this then that she (Plaintiff) would have won in an angry loud voice.  (Plaintiff's Exhibit 3)

23.   On November 4, 2009 Plaintiff received a notice of a Pre-determination hearing from Greg Stricklin alleging the Plaintiff had forgotten to send out some collection contracts.  The hearing was scheduled for November 6, 2009 which was a violation of the Defendant's policy that a minimum of 4 day notice must be given for a pre-determination hearing. (Plaintiff's Exhibit 21)

24.   On November 30, 2009 CFO Valenzuela met with the Plaintiff to give her the findings of the hearing (dated 11/25/10).  In the findings the Plaintiff was found to have committed the charges although no clearly defined actions to substantiate the charges were ever given. Plaintiff was given one work week (5 work days) suspension without pay to be held in abeyance for 6 months. If after six months the Plaintiff had no serious violations during that time, it would be reduced to a Letter of Reprimand in her central personnel file and could be used against her for further discipline. Plaintiff was also directed to attend ERP and purchasing training and if she failed to attend the training it would be seen as insubordinate.  Finally the ruling stated that "The one (1) work week suspension without pay held in abeyance addresses the seriousness of the offense, but also allows you the opportunity to correct your behavior and address issues and future assignments in a timely fashion, as well as work with supervisors, co-workers, and subordinates to conduct the business of the City of Albuquerque in an efficient and timely fashion and serve the public." (November 25, 2009 Memo, Defendant's Exhibit 5 and 6)

24.   On December 16, 2009 Plaintiff met with Greg Stricklin and Lou Hoffman where she was given a memo that rescinded the Disciplinary action.  Plaintiff was told by Lou Hoffman that he was giving me the benefit of the doubt and that he did not want to see her back in his office.  Plaintiff told him that she had not done anything wrong and that she had constantly asked for help and had not gotten any.  Plaintiff explained that they were still missing deadlines due to the volume of work. (Defendant's Exhibit D)

25.   On September 14, 2010 Mrs. Yara sent an email to the Plaintiff changing her hours from 7a – 4p to 8a -5p effective September 20, 2010.  The email also stated that the Plaintiff once again could no longer could make up time and would have to submit P-30s. (Defendant's Exhibit G)

26.   In September 2010, Plaintiff once again contacted her Union Representative to complain about Mrs. Yara being returned as her supervisor and once again reiterating that Mrs. Yara was singling the Plaintiff out.  (Plaintiff Exhibit 4)

27.  On September 17, 2010 the Plaintiff and Patti French met with Lou Hoffman and Cindy Jaramillo.  At the meeting the Plaintiff explained to Lou Hoffman that Stephanie Yara had been taken away from supervising her and that she was placed directly under Greg Stricklin. Plaintiff then told Lou Hoffman that she believed that Stephanie's actions were racist and that she had shown a pattern of harassment and disparate treatment toward her that had gotten worse over time. She had already tried in the past to change Plaintiff's hours and to not allow her to make up time and that as soon as she had the opportunity, she did it again. Plaintiff additionally told Lou that Stephanie only directed her hostile treatment towards her.  Finally Plaintiff provided Mr. Hoffman with a brief overview of Yara's actions as her former supervisor and spoke of the embarrassment and humiliation Yara's actions had caused and that she wanted her upgrade and raise that she had been waiting for it for more than 2 years. (Plaintiff's Exhibit 4)

28. On December 21, 2012 Plaintiff was issued a Letter of Instruction by Jessie Muniz. (Plaintiff's Exhibits 12 and 13)

**STANDARD**

Under Federal Rule of Civil Procedure 56(c) Summary Judgment is only appropriate if the **record contains no evidence** of a genuine issue of material fact and demonstrates that the moving party is entitled to judgment as a matter of law. Woodman v. Runyon, 132 F.3d 1330, 1337 (10th Cir. 1997).  Courts give the non-movant "**wide berth** to prove a factual controversy exists." Ulissey v. Shvartsman, 61 F.3d 805, 808 (10th Cir. 1995). The court does not weigh the evidence, but instead determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is **so one-sided** that one party must prevail as a matter of law." Bingaman v. Kansas City Power & Light Co., 1 F.3d 976, 980 (10th Cir. 1993) (internal quotation marks and citation omitted). In making this determination, the court views the record and all reasonable inferences drawn there from **in the light most favorable** to the nonmoving

party. See *Thomas v. Int'l Bus. Machs., 48 F.3d 478, 484 (10th Cir. 1995). Belhomme v. Widnall, 127 F.3d 1214, 1216 (10th Cir. 1997), cert. denied, 118 S. Ct. 1569 (1998).*

## ARGUMENT

### Plaintiff is Entitled to Summary Judgment as a matter of law.

Plaintiff has filed three EEOC charges alleging on going discrimination and retaliation starting in 2007 and continuing through the present (Defendant's Exhibit N)  Plaintiff filed a subsequent EEOC charge on January 9, 2012  (Defendant's Exhibit T)  On August 20 2013 The Department of Justice issued a Right to Sue letter to the Plaintiff for the Three claims (Plaintiff's Exhibit 22)  Finally Plaintiff filed her Complaint based upon these three complaints on October 1, 2013 within the 90 day right to sue requirement.  Because the Plaintiff was not allowed to file her claims until she received the Right to Sue, all claims are proper and timely.

### Defendants Argument I.  That the Plaintiff was not denied reclassification and pay raises.

Defendants use the argument that the Plaintiff had her job grade changed from an E-14 to an M-14 position on November 10, 2011 and that this was a pay raise.  First we would point out that this classification came almost five years after the Plaintiff had been moved into the position. (Defendant's Exhibit A).  In addition this reclassification was done after the Plaintiff had filed her first charge of Discrimination with the EEOC.  (Defendant's Exhibit N and O)

Second the September 10, 2011 reclassification from an E-14 to an M-14 should not be considered a pay raise as prior to Plaintiff being moved into DFAS supervisory position in November 27, 2006 she had previously been classified as an E-14 Accountant II.  Upon being moved into the DFAS supervisory position the Plaintiff was made an M-14 Fiscal Analyst.  After being moved into the position, the Plaintiff pointed out to Cindy Jaramillo the DFAS Human Resources Coordinator that her classification as an M-14 employee would result in her making

less per hour that when she was an E-14.  It was only after this decrease in pay was pointed out that the Plaintiff was reclassified back to the E-14 position as an E-14 Fiscal Analyst.

As the Defendant had already made the Plaintiff an M-14 in 2006 and then moved her back to being an E-14 shows that the September 10, 2011 reclassification from E-14 to M-14 was something that had already been attempted in November 2006 and was not a new reclassification.

City Policy dictates that when a non-M series supervisor is moved into an M position, they must be moved into the closest **higher** rate.  (City Rules and Regulations, Plaintiff's Exhibit 9).  When the Plaintiff was made a bargaining unit employee on September 10, 2011 from a non-bargaining E series, the Defendants had to place her at the M-14 step 3 as making her an M-14 step 2 would have taken the Plaintiff's pay from $19.18 an hour to $18.80 per hour. (E and M series pay rates Plaintiff's Exhibits 10 and 11).

This shows that the September 10, 2011 reclassification of E series non-bargaining unit to M series bargaining unit was a change in union status that required the Plaintiff be placed at the Step 3 position and was not a merit based reclassification or raise in pay.


***Defendant's Argument II. That Plaintiff's alleged discipline does not constitute an adverse employment action.***

The Defendant is attempting to frame the Plaintiff's November 25, 2009 Discipline and Five day suspension as not arising to an Adverse Employment action (Plaintiff's Exhibit 6) because of the fact that the Discipline was rescinded on December 17, 2009 (Defendant's Exhibit D).

This argument is shown to be false by looking at the facts and intentions of those involved in the Discipline.

The above listed discipline process began on or around October 29, 2009 when the Plaintiff's supervisor Greg Stricklin proposed bringing a disciplinary action against the Plaintiff.  (Plaintiff's Exhibit 21)  The discipline was to be centered around an allegation that the Plaintiff did not send out five collections contracts.  Leading up to the Pre-determination letter there were numerous

communications between various managers concerning what allegations to charge the Plaintiff with. (October/November 2009 Emails, Plaintiff's Exhibits 7 and 8).

What is most shocking and shows extreme bad intent and harassment towards the Plaintiff is that in discussing the allegations to be brought against the Plaintiff, her supervisor Greg Stricklin stated that he did not have anything to substantiate an allegation that the Plaintiff lied or misled him.  According to the emails, all of the management including the CFO Mark Valenzuela and Director Tanda Meadors knew that Mr. Stricklin could not substantiate a False Statements/Fraud allegation.  Despite this Greg Stricklin was advised by several upper level managers to leave in the false allegations.  (October/November 2009 Emails, Plaintiff's Exhibits 7 and 8).  In reaction to these emails Greg Stricklin knowingly, purposely and at the express consent of the CFO and Director brought false allegations against the Plaintiff.   (October/November 2009 Emails, Plaintiff's Exhibits 7 and 8).

These emails show that the Defendants were willing to bring charges against the Plaintiff even though there was no evidence that the charges were valid and contrary to Greg Stricklin's assertions that the charge was false.   Not only were these false charges maliciously and knowingly brought against the Plaintiff but the charges were used as a basis for the discipline and the five day suspension (Plaintiff's Exhibit 6).    These false charges were included in the Predetermination letter (Plaintiff's Exhibit 21), the Findings & Recommendations on the Predetermination Hearing for the Plaintiff (Plaintiff's Exhibit 5) and then ultimately discussed as being used as a basis for the Disciplinary Action on November 25, 2009 (Plaintiff's Exhibit 6).

Finally in the Disciplinary Action issued by the CFO Mark Valenzuela, the 301.9 allegation of False Statements/Fraud was used as a basis of the decision to discipline the Plaintiff including the decision to suspend the Plaintiff for five days.  CFO Mark Valenzuela imposed this discipline knowing that the allegation was falsely made by the Plaintiff's supervisor.  (October/November 2009 Emails, Plaintiff's Exhibits 7 and 8).

The Defendant's suspension of the Plaintiff for five days without pay is definitively an adverse employment action.

Next the Defendant argues that the November 2009 discipline was withdrawn and therefore not an adverse action. First it is important to distinguish that from November 25, 2009 to December 17, 2009 the Plaintiff was working under the threat of suspension and further disciplinary action including termination is any further events happened. (Plaintiff's Exhibit 6). Next it is important to distinguish that the withdrawal of the discipline happened only after there was a change in the Mayor and his administration and the CFO Mark Valenzuela was terminated and a new Director of Finance Lou Hoffman was appointed. (Plaintiff's Exhibit 1 Depo of Lou Hoffman Pages 7 lines 24 and 25 through Page 8 Lines 1- 12).

This shows the withdrawal of the discipline was only brought about because of a new Mayor and administration coming in. It is permissible speculation that had the administration not been voted out of office, the CFO Mark Valenzuela would not have withdrawn the discipline as he had already shown the intent to impose the discipline on November 25, 2009 and in light of the fact that he knew it contained false allegations against the Plaintiff.

Finally the 10th Circuit has ruled on circumstances similar to these when they ruled that "Actions such as suspensions or terminations are by their nature adverse, even if subsequently withdrawn." *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998).

The Defendants then go on to reference a draft letter of instruction given to the Plaintiff on December 21, 2011. (Defendant's Exhibit U Depo of Linda Allen p. 106 lines 5-13 and Plaintiff's Exhibit 12). While the courts have ruled that a draft letter that is not put into an employee's file does not normally rise to the level of an adverse employment action, we contend that based upon the prior history of the Defendant bringing false allegations and then knowingly using the false allegations as a basis for discipline and suspension, raises the draft letter to the level of an adverse employment action. In addition the letter of instruction as given to the Plaintiff did not contain the words draft on it and contains no language to indicate to the Plaintiff

that it is a Draft (Plaintiff's Exhibit 12) and in fact according to the Jesse Muniz, he had a meeting with and intended to present the letter to the Plaintiff (Plaintiff's Exhibit 13).  It is reasonable to conclude that in light of the prior history of the defendant knowingly and maliciously bringing false allegations would cause stress and harm to the Plaintiff when subsequent discipline is proposed.

**Defendant's Argument III. That there is no adverse employment action in connection with Plaintiff's disputes with Leola Sena.**

Leola Sena is an employee who was assigned to work for the Plaintiff In Early April 2012.  Over the next two years Leola's conduct towards the Plaintiff became more and more extreme.  After numerous complaints Leola was finally moved from the Plaintiff's office on June 12, 2014. (Defendant's Exhibit U Linda Allen Depo Page 69 lines 1-5, page 70 lines 1-11, page 85 lines 1-16, page86 lines 1-24).

While the Defendant is alleging Mrs. Sena was being treated unfairly the documents show that it was the Plaintiff who was afraid of Mrs. Sena and that management and Cindy Jaramillo supported and encouraged Mrs. Sena and not the Plaintiff.  (Defendant's Exhibits x, DD, FF and II).

In Gunnell v. Utah Valley State College152 F.3d 1253, 1264 (10th Cir. 1998).,the Tenth Circuit expanded the scope of actionable adverse action to include coworker hostility or retaliatory harassment, "if sufficiently severe."

In the present case the fact that the Plaintiff for reported that she was afraid of Mrs. Sena and the fact that even in light of Plaintiff's complaints, management supported Mrs. Sena created a severe and hostile work environment.  The fact that the Defendant did not move Mrs. Sena for two years created an adverse environment for the Plaintiff.

Finally it should be noted that the Tenth Circuit has liberally interpreted the adverse action requirement in its decisions. In Corneveaux v. CUNA Mut. Ins. Group, 76 F.3d 1498, 1507 (10th Cir. 1996) the court found an adverse employment action based on the fact the employee had to

"go through several hoops" in order to obtain her severance benefits. In <u>Jeffries v. State of Kansas</u>, 147 F.3d 1220 (10th Cir. 1998). the court held that the retaliation alleged by the employee (verbal interrogation and reprimand, threats to withdraw supervision and not renew her contract) was sufficient to constitute adverse employment action although it did not actually have an adverse impact on the terms and conditions of her employment.

***Defendant's Argument b. That Plaintiff cannot establish that her adverse employment actions occurred in circumstances giving rise to an inference of discrimination.***

During the Plaintiff's employment there have been numerous examples of when the Plaintiff was treated differently than her non-African American co-workers.

The most glaring examples of this have been that Stephanie Yara has required the Plaintiff to keep track of her time, to submit P-30 forms for her absences and not allowing the Plaintiff to make up time when she had a doctor's appointment while the other supervisor Geri Maurino (Hispanic female) and then her replacement Naydene Castaneda (Hispanic female) were not required to do the same.  (Plaintiff's Exhibit 14 Page 44 lines 16-25, Page 45 lines 1-25, Page 46 lines 1-25, Page 47 lines 1-25, Page 48 lines 1-25, Page 49 lines 1-25 and Page 50 lines 1-3)

Also when the Plaintiff was becoming ill from her treatment by the Defendant and asked for FMLA, the request was questioned by Lou Hoffman (Plaintiff's Exhibit 16) and Mrs. Yara (Plaintiff's Exhibit 14 Page 43 lines 9-23) while the Plaintiff's employee Krista Wagner (white female) was never questioned (Plaintiff's Exhibit 14 Page 43 lines 9-23).

In reaction to this treatment, Plaintiff on numerous occasions complained about her being treated in a racial discriminatory manner by supervisor Yara.  The first time was in July 2009 when the Plaintiff went to her Union Steward Patty French and complained that her supervisor Stephanie Yara was treating her differently than other employees (Plaintiff's Exhibit 2 page 12 lines 12-20 and Plaintiff's Exhibit3).  The Plaintiff and Patty French then had a meeting with Greg Stricklin and Tanda Meadors to discuss Mrs. Yara's treatment on July 15, 2009 (Plaintiff's Exhibit 3). Pursuant to that meeting Tanya Director Meadors moved Mrs. Yara from supervising the

Plaintiff.  Mr. Yara was extremely upset at being moved and felt that it showed that "Linda won" (Plaintiff's Exhibit 3).

The problems arose again when Lou Hoffman placed Mrs. Yara back as Plaintiff's supervisor (Plaintiff's Exhibit 1 Page 11 lines 19-24).  Mr. Hoffman did this despite knowing that the Plaintiff had alleged that Mrs. Yara took away some of her supervisory duties (Plaintiff Exhibit 1 Page 18 lines12-17) that the Plaintiff had made allegations of discrimination against Mrs. Yara (Plaintiff's Exhibit 1, Page 19, lines 13-20), and that the Plaintiff was making allegations that other non-African Americans were being treated differently (Plaintiff's Exhibit 1, Page 22, lines 8-14).

In fact when asked about some of the incidents concerning Mrs. Yara and whether he had investigated or looked into the complaints, Mr. Hoffman answered "I honestly didn't think that was my job".  (Plaintiff's Exhibit 1, Page 18, lines 19-25).  This indifference to the Plaintiff's complaints shows the attitude she was dealing with at the Director level regarding complaints she made about her supervisor Mrs. Yara.

In reaction to Mrs. Yara being again assigned to be Plaintiff's supervisor, Plaintiff again went to her Union steward Patty French (Plaintiff's Exhibit 4).  At that time the Plaintiff, Patty French had a meeting with Director Lou Hoffman and Human Resources Cindy Jaramillo (Plaintiff's Exhibit 4).  At this meeting the Plaintiff discussed her accomplishments in implementing collections and a collections process, asked why she still had not received a pay raise as was previously promised even though there were several males that had been given raises for working outside their job classification, Plaintiff asked about the desk audit that had been turned in in 2008, and discussed the fact that she believed Mrs. Yara was racist and treated her differently by recently changing her work hours with only two days warning (Plaintiff's Exhibit 4 and Exhibit 2 Page 18, lines 3-13).  After that meeting Plaintiff to complaint to Mrs. French that the desk audit was still never done and that Mrs. Yara was still singling the Plaintiff out (Plaintiff's Exhibit 2 Page 26 lines 1-20).

The discrimination and disparate treatment of the Plaintiff by Mrs. Yara took other forms for example Supervisor Yara would often look for and even fabricate complaints against the Plaintiff (Plaintiff Exhibit 14 page 59 lines4-23).

In this matter an email was sent to Mrs. Yara by a City IT person concerning the Plaintiff asking for a monitor and a video card for her employee.  Mrs. Yara then took the email and sent it to human Resources characterizing it as an Accounting A/R issue and that the computer IT department would no longer help out with Linda Allen's computer issues (Plaintiff's Exhibit 15). As can be seen in the email, Mrs. Yara exaggerates and changes the content of the accompanying email from the IT department to make it appear they are complaining about the Plaintiff.  Mrs. Yara then stated she was looking for other complaints about Mrs. Allen but couldn't find them. Finally Mrs. Yara goes so far as to speculate that other complaints were sent to Greg (Stricklin) even though she had no evidence of this happening (Plaintiff's Exhibit 15).

Mrs. Yara also denied the Plaintiff's requests for raises stating that "(Plaintiff) has requested this several times from Greg Stricklin and myself.  I did not feel her job performance warranted a raise and I never took it any further" (Plaintiff's Exhibit 19).

On November 4, 2010 the Plaintiff asked for an Accommodation under the American with Disabilities Act.  In response Director Lou Hoffman challenged the request and then instead of accommodating the plaintiff instead discussed reassigning the Plaintiff (Plaintiff's Exhibit 16)

Finally in reply to the Plaintiff's requests for a raise that were made to Lou Hoffman  (Plaintiff's Exhibit 3) it should be noted that on March 20, 2010 Director Lou Hoffman gave Terry Suarez (Hispanic female) as two step raise from $39.70 an hour to $43.78 an hour.  (Plaintiff's Exhibit 17) and on March 4, 2010 Director Lou Hoffman recommended that one of Mrs. Yara's other direct reports Laurice Chappell (Hispanic Female) be given a level advance from E-17 to E-18 (Plaintiff's Exhibit 18).

This demonstrates that the Defendant could and did give raises when they wanted and that their assertions that there were no funds are without merit.

***Defendant's Argument 2. That Defendant had legitimate non-discriminatory reasons for their actions.***

***a. Plaintiff's claim she was not allowed to hire.***

As previously stated, Plaintiff went from having 4 fulltime clerks to having one part-time employee. During this time the Plaintiff made numerous requests for additional staff. While Mrs. Yara states that only positions deemed critical were filed, and that is why the Plaintiff did not get her positions filed (Defendant's Exhibit S, Page 27, lines 1-22 and Page 32 lines 1-12) she also indicates that she moved one of Plaintiff's positions (Plaintiff's Exhibit 19).

We would also point out that the person making the statement (Yara) about only critical positions being filed is also the person who the Plaintiff is accusing of being discriminatory.  Because of this Yara's statements should be read with her actions towards the Plaintiff in mind.

For if the Plaintiff's clerks and department were not critical employees, why was the Plaintiff reprimanded for failing to send out contracts (Plaintiff's Exhibit 5, 6 and 21).  The assertion that the Defendant's Accounts Receivable and collections department were not critical areas is not worth of credence.

***b. Draft letter of instruction***

The Defendant fails to mention the November 25, 2009 disciplinary action in this assertion.  We will reiterate our earlier assertions concerning both letters.

As previously stated, The Defendant previously attempted to frame the Plaintiff's November 25, 2009 Discipline and Five day suspension as not arising to an Adverse Employment action (Plaintiff's Exhibit 6) because of the fact that the Discipline was rescinded on December 17, 2009 (Defendant's Exhibit D).

This argument is shown to be false by looking at the facts and intentions of those involved in the Discipline.

The above listed discipline process began on or around October 29, 2009 when the Plaintiff's supervisor Greg Stricklin proposed bringing a disciplinary action against the Plaintiff. (Plaintiff's Exhibit 21)  The discipline was to be centered around an allegation that the Plaintiff did not send out five collections contracts.  Leading up to the Pre-determination letter there were numerous communications between various managers concerning what allegations to charge the Plaintiff with. (October/November 2009 Emails, Plaintiff's Exhibits 7 and 8).

  What is most shocking and shows extreme bad intent and harassment towards the Plaintiff is that in discussing the allegations to be brought against the Plaintiff, her supervisor Greg Stricklin stated that he did not have anything to substantiate an allegation that the Plaintiff lied or misled him.  According to the emails, all of the management including the CFO Mark Valenzuela and Director Tanda Meadors knew that Mr. Stricklin could not substantiate a False Statements/Fraud allegation.  Despite this Greg Stricklin was advised by several upper level managers to leave in the false allegations.  (October/November 2009 Emails, Plaintiff's Exhibits 7 and 8).  In reaction to these emails Greg Stricklin knowingly, purposely and at the express consent of the CFO and Director brought false allegations against the Plaintiff.   (October/November 2009 Emails, Plaintiff's Exhibits 7 and 8).

These emails show that the Defendants were willing to bring charges against the Plaintiff even though there was no evidence that the charges were valid and contrary to Greg Stricklin's assertions that the charge was false.  Not only were these false charges maliciously and knowingly brought against the Plaintiff but the charges were used as a basis for the discipline and the five day suspension (Plaintiff's Exhibit 6).   These false charges were included in the Predetermination letter (Plaintiff's Exhibit 21), the Findings & Recommendations on the Predetermination Hearing for the Plaintiff (Plaintiff's Exhibit 5) and then ultimately discussed as being used as a basis for the Disciplinary Action on November 25, 2009 (Plaintiff's Exhibit 6).

Finally in the Disciplinary Action issued by the CFO Mark Valenzuela, the 301.9 allegation of False Statements/Fraud was used as a basis of the decision to discipline the Plaintiff including the

decision to suspend the Plaintiff for five days.  CFO Mark Valenzuela imposed this discipline knowing that the allegation was falsely made by the Plaintiff's supervisor.  (October/November 2009 Emails, Plaintiff's Exhibits 7 and 8).

The Defendant's suspension of the Plaintiff for five days without pay is definitively an adverse employment action.

Next the Defendant argues that the November 2009 discipline was withdrawn and therefore not an adverse action.  First it is important to distinguish that from November 25, 2009 to December 17, 2009 the Plaintiff was working under the threat of suspension and further disciplinary action including termination is any further events happened.  (Plaintiff's Exhibit 6).  Next it is important to distinguish that the withdrawal of the discipline happened only after there was a change in the Mayor and his administration and the CFO Mark Valenzuela was terminated and a new Director of Finance Lou Hoffman was appointed.  (Plaintiff's Exhibit 1 Depo of Lou Hoffman Pages 7 lines 24 and 25 through Page 8 Lines 1- 12).

This shows the withdrawal of the discipline was only brought about because of a new Mayor and administration coming in.  It is permissible speculation that had the administration not been voted out of office, the CFO Mark Valenzuela would not have withdrawn the discipline as he had already shown the intent to impose the discipline on November 25, 2009 and in light of the fact that he knew it contained false allegations against the Plaintiff.

Finally the 10th Circuit has ruled on circumstances similar to these when they ruled that "Actions such as suspensions or terminations are by their nature adverse, even if subsequently withdrawn." *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998).

The Defendants then go on to reference a draft letter of instruction given to the Plaintiff on December 21, 2011.  (Defendant's Exhibit U Depo of Linda Allen p. 106 lines 5-13 and Plaintiff's Exhibit 12).  While the courts have ruled that a draft letter that is not put into an employee's file does not normally rise to the level of an adverse employment action, we contend that based upon the prior history of the Defendant bringing false allegations and then knowingly

using the false allegations as a basis for discipline and suspension, raises the draft letter to the level of an adverse employment action. In addition the letter of instruction as given to the Plaintiff did not contain the words draft on it and contains no language to indicate to the Plaintiff that it is a Draft (Plaintiff's Exhibit 12) and in fact according to the Jesse Muniz, he had a meeting with and intended to present the letter to the Plaintiff (Plaintiff's Exhibit 13). It is reasonable to conclude that in light of the prior history of the defendant knowingly and maliciously bringing false allegations would cause stress and harm to the Plaintiff when subsequent discipline is proposed.

The false information and allegations contained in the first discipline by the Plaintiff's supervisor Gregg Stricklin and CFO Valenzuela show that there is no legitimate business reasons for their actions.

### C. Plaintiff's Equal Protection claims

The Plaintiff here by incorporates the Defendant's various claims on Plaintiff's Equal Protection claim.

A plaintiff in an equal protection action has the burden of demonstrating discriminatory intent. Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 265, 50 L. Ed. 2d 450, 97 S. Ct. 555 (1977); Washington v. Davis, 426 U.S. 229, 241-42, 48 L. Ed. 2d 597, 96 S. Ct. 2040 (1976). It is not necessary to demonstrate that the challenged action was taken solely for discriminatory purposes; it is necessary only to prove that a discriminatory purpose was a motivating factor. Village of Arlington Heights, 429 U.S. at 265 (discussing Washington v. Davis).

As outlined above in the discrimination argument, Plaintiff has shown numerous times when she was treated differently than her similarly situated non-African American coworkers. Plaintiff showed that Stephanie Yara has required the Plaintiff to keep track of her time, to submit P-30 forms for her absences and not allowing the Plaintiff to make up time when she had a doctor's appointment while the other supervisor Geri Maurino (Hispanic female) and then her replacement

Naydene Castaneda (Hispanic female) were not required to do the same.  (Plaintiff's Exhibit 14 Page 44 lines 16-25, Page 45 lines 1-25, Page 46 lines 1-25, Page 47 lines 1-25, Page 48 lines 1-25, Page 49 lines 1-25 and Page 50 lines 1-3)

Also when the Plaintiff was becoming ill from her treatment by the Defendant and asked for FMLA, the request was questioned by Lou Hoffman (Plaintiff's Exhibit 16) and Mrs. Yara (Plaintiff's Exhibit 14 Page 43 lines 9-23) while the Plaintiff's employee Krista Wagner (white female) was never questioned (Plaintiff's Exhibit 14 Page 43 lines 9-23).

Finally Plaintiff showed that she was subject to extreme harassing and improper conduct by her supervisors when they brought the November 26, 2009 disciplinary action against the Plaintiff.

As was discussed, the listed discipline process began on or around October 29, 2009 when the Plaintiff's supervisor Greg Stricklin proposed bringing a disciplinary action against the Plaintiff. (Plaintiff's Exhibit 21)  The discipline was to be centered around an allegation that the Plaintiff did not send out five collections contracts.  Leading up to the Pre-determination letter there were numerous communications between various managers concerning what allegations to charge the Plaintiff with. (October/November 2009 Emails, Plaintiff's Exhibits 7 and 8).

 What is most shocking and shows extreme bad intent and harassment towards the Plaintiff is that in discussing the allegations to be brought against the Plaintiff, her supervisor Greg Stricklin stated that he did not have anything to substantiate an allegation that the Plaintiff lied or misled him.  According to the emails, all of the management including the CFO Mark Valenzuela and Director Tanda Meadors knew that Mr. Stricklin could not substantiate a False Statements/Fraud allegation.  Despite this Greg Stricklin was advised by several upper level managers to leave in the false allegations.  (October/November 2009 Emails, Plaintiff's Exhibits 7 and 8).  In reaction to these emails Greg Stricklin knowingly, purposely and at the express consent of the CFO and Director brought false allegations against the Plaintiff.   (October/November 2009 Emails, Plaintiff's Exhibits 7 and 8).

These emails show that the Defendants were willing to bring charges against the Plaintiff even though there was no evidence that the charges were valid and contrary to Greg Stricklin's assertions that the charge was false.  Not only were these false charges maliciously and knowingly brought against the Plaintiff but the charges were used as a basis for the discipline and the five day suspension (Plaintiff's Exhibit 6).   These false charges were included in the Predetermination letter (Plaintiff's Exhibit 21), the Findings & Recommendations on the Predetermination Hearing for the Plaintiff (Plaintiff's Exhibit 5) and then ultimately discussed as being used as a basis for the Disciplinary Action on November 25, 2009 (Plaintiff's Exhibit 6).

Finally in the Disciplinary Action issued by the CFO Mark Valenzuela, the 301.9 allegation of False Statements/Fraud was used as a basis of the decision to discipline the Plaintiff including the decision to suspend the Plaintiff for five days.  CFO Mark Valenzuela imposed this discipline knowing that the allegation was falsely made by the Plaintiff's supervisor.  (October/November 2009 Emails, Plaintiff's Exhibits 7 and 8).

These facts in their totality show that the Defendant took actions against the Plaintiff that were discriminatory and outrageous.  Because of this Plaintiff shows that her Equal Protection Rights were violated by the Defendant's willful and outrageous conduct.

***Plaintiff's retaliation claims.***

The Defendant is attempting to use the Plaintiff's 2012 EEOC filing as the only event from which retaliation can stem (Defendant's Exhibit T).  Plaintiff would contend that there are numerous complaints that the Plaintiff made that retaliation flowed from.

The first is when the Plaintiff went to the Union to complain about discrimination in July of 2009 (Plaintiff's Exhibit 3).  Because of Plaintiff's Union complaints a meeting was held on July 15, 2009 between the Plaintiff, the Union Representative, the Director Tanda Meadors and Plaintiff's second level supervisor Greg Stricklin.  At this meeting the Plaintiff complained of racism and discrimination by her supervisor Yara.  Because of this meeting Greg Stricklin was assigned the supervision of the Plaintiff (Plaintiff's Exhibit 3).

Four months later Mr. Stricklin brought the November 2009 Predetermination letter against the Plaintiff.  As we have already discussed at length, this letter and the subsequent discipline was based upon false information knowingly brought by Mr. Stricklin.  (Plaintiff's Exhibits 5, 6 and 21).

The second set of complaints came about when the Plaintiff made a second complaint to the Union about Mrs. Yara being returned as her supervisor (Plaintiff's Exhibit 4) and then making an EEOC complaint about her discriminatory treatment (Defendant's Exhibit N).  After Plaintiff made these complaints, Supervisor Yara required the Plaintiff to keep track of her time, to submit P-30 forms for her absences and did not allow the Plaintiff to make up time when she had a doctor's appointment while the other supervisor Geri Maurino (Hispanic female) and then her replacement Naydene Castaneda (Hispanic female) had not and were not required to do the same. (Plaintiff's Exhibit 14 Page 44 lines 16-25, Page 45 lines 1-25, Page 46 lines 1-25, Page 47 lines 1-25, Page 48 lines 1-25, Page 49 lines 1-25 and Page 50 lines 1-3)

Also when the Plaintiff was becoming ill from her treatment by the Defendant and asked for FMLA, the request was questioned by Lou Hoffman (Plaintiff's Exhibit 16) and Mrs. Yara (Plaintiff's Exhibit 14 Page 43 lines 9-23) while the Plaintiff's employee Krista Wagner (white female) was never questioned (Plaintiff's Exhibit 14 Page 43 lines 9-23).


### Plaintiff's Breach of Contract claim

Defendants only rationale for dismissing the Plaintiff's contract claims is a reference to another case the Plaintiff's attorney handled *Linda Townsend Johnson v. Rio Rancho Public Schools*. While the cases have similar verbiage this is to be expected when cases against governmental agencies are brought.  But the similarities end there.  The Townsend Johnson case involved a Principle of a grade school who was given a one year contract for her employment.  The contract was not renewed by the Defendant at the end of the term.  In that matter Plaintiff alleged the

Defendant's had violated numerous provisions of her one year contract.  In the present case there is no direct written contract between the parties.

In the present case the Plaintiff is alleging the Defendant breached its Rules and Regulations by various ways including only giving the Plaintiff two days to reply to a Pre-determination letter and submitting false and malicious accusations in the Pre-determination letter and subsequent disciplinary report in violation of the Defendants Rules concerning disciplinary procedure, Rule 301. Standard of Conduct requiring an Employee to maintain professional standards and Rule 301.9 False Statements/Fraud stating that no employee shall willfully make any false statements...report to any…investigation or in any manner commit any fraud (Outlined in Plaintiff's Exhibits 5, 6 and 21).

Wherefore, Plaintiff requests that the Defendant's Motion for Summary Judgment be denied.

Respectfully submitted:

\_\_/s/ Christopher N. Orton\_\_\_\_\_
Christopher N. Orton
12231 Academy Rd. NE
#301-304
Albuquerque, NM 87111
(505) 266-2753

I hereby certify that a true and correct copy of the foregoing pleading was caused to be served by electronic filing to all counsel of record on this December 8, 2014.

\_\_/s/ Christopher N. Orton_____

25