## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

LINDA ALLEN,

       *Plaintiff,*

v.                                  No. Civ. 14-0059 JCH/RHS

THE CITY OF ALBUQUERQUE,
MAYOR RICHARD J. BERRY,
in his official capacity as Mayor of Albuquerque,

       *Defendants.*

## MEMORANDUM OPINION AND ORDER

On November 6, 2014, Defendants the City of Albuquerque (the "City") and Mayor Richard J. Berry filed a Motion for Summary Judgment (ECF No. 22).  The Court, having considered Defendants' motion for summary judgment, the briefs, evidence, relevant law, and otherwise being fully advised, concludes that Defendant's motion for summary judgment should be granted.

## I.    FACTUAL BACKGROUND

Plaintiff Linda Allen was hired by the City on June 27, 1987. Defs.' Mem., Undisputed Fact ("UF") ¶ 1. Plaintiff is African American. *Id.*, UF ¶ 2. On November 17, 2006, Plaintiff was administratively transferred by Director Tanda Meadors into the position of an Accountant II within the Accounting Division. Defs.' Ex. A, ECF No. 23-1. Plaintiff was told that her grade and step would remain the same. *See id.*[1]

---

[1] The parties dispute whether Plaintiff's rate of pay and job title actually remained the same. Defendant relies on a Memorandum from Ms. Meadors to Plaintiff asserting that her grade and step would remain unchanged, but the statement amounts in inadmissible hearsay. *See* Defs.' Ex. A, ECF No. 23-1. Plaintiff also relies on inadmissible evidence to support her assertion that she went from an E-14 to an M-14 employee, resulting in a loss of pay.

When Plaintiff took over this position, she supervised four Financial Technician clerical employees. Pl.'s Resp., UF ¶ 2, ECF No. 32. Two of the clerical employees were in the Special Assessment District ("SAD") Department and two were in the Accounts Receivable ("AR") department. *See id.* Stephanie Yara became Plaintiff's supervisor sometime during the period in which Ms. Allen managed four employees. *See* Defs.' Ex. F 27:22-29:18, ECF No. 23-6. Ms. Yara also supervised Laurice Chappell, an E-17 accounting specialist and supervisor of payroll clerks, and Gerri Maurino, an E-14 accounts payable ("AP") supervisor and fiscal analyst. *See id.* at 31:11-32:18, ECF No. 23-6; Pl.'s Ex. 14 at 44:16-45:3.

In October 2007, one of Plaintiff's clerical employees, Lupe Gallegos transferred to a position at the Albuquerque Police Department ("APD"). *See* Defs.' Ex. F 27:22-29:20, ECF No. 23-6; Pl.'s Ex. 19, ECF No. 32-19. *See id.* In August 2008, Loretta Cordova, another subordinate, retired. *See* Defs.' Ex. F 27:22-29:20, ECF No. 23-6; Pl.'s Ex. 19, ECF No. 32-19. Ms. Yara did not replace Ms. Gallegos or Ms. Cordova. *See* Defs.' Ex. F 27:22-29:20, ECF No. 23-6; Pl.'s Ex. 19, ECF No. 32-19. Mr. Stricklin instructed Ms. Yara not to fill vacant positions at that time due to the City's budget crunch. *See* Defs.' Ex. F 27:22-28:22, ECF No. 23-6.

Plaintiff felt that Ms. Yara treated other employees more favorably than her. *See* Pl.'s Ex. 14, 43:9-13, ECF No. 32-14. Ms. Yara had a habit of directing Plaintiff's subordinates, particularly Krista Wagner, allowing them to go directly to her and circumvent Plaintiff, undermining Plaintiff's supervisory authority. *See id.* at 44:3-13, 55:8-56:16. In one instance,

---

Plaintiff relies on Exhibit 20 (ECF No. 32-20), entitled "EEOC Rebuttal." Defendants object to the Court's consideration of Exhibit 20 because it is undated, unsigned, and non-notarized. *See* Defs.' Reply 3-4, ECF No. 36. Unsworn statements are not competent summary judgment evidence sufficient to create a genuine issue as to any material fact. *See Hayes v. Marriott*, 70 F.3d 1144, 1148 (10th Cir. 1995). The Court cannot consider the unsworn, unsigned EEOC Rebuttal document as admissible evidence. To the extent any of the facts Plaintiff relies upon are supported by other admissible evidence in the record, the Court has considered that evidence. For those facts set forth and supported by Defendants in their summary judgment brief that Plaintiff failed to properly refute with admissible evidence, the Court will deem those facts undisputed. For the same reasons, this Court will not consider Defendants' Exhibit II or Exhibit NN, to which Plaintiff objects, because Exhibit II is an unsworn, inadmissible statement, and Exhibit NN photograph is inadmissible without an accompanying sworn statement stating what it is.

Plaintiff told Ms. Wagner to move her desk back to where she could see her, but Ms. Yara, in front of Plaintiff, told Ms. Wagner she could keep it where she was. *See id.* at 55:6-56:16. Another time, a subordinate employee yelled at Plaintiff, but Ms. Yara did not stop the yelling, instead she told Plaintiff that she was mean to the employee. *See id.* at 56:18-57:11.

In 2008, Krista Wagner took leave under the Family and Medical Leave Act ("FMLA"), and Ms. Yara never questioned her regarding her use of FMLA. *See id.* 43:9-44:19, ECF No. 32-14. In February 2009, Ms. Wagner moved to another position with the City, and she also was not replaced. *See* Defs.' Mem., Ex. F 27:22-31:2, ECF No. 23-6; Pl.'s Ex. 19, ECF No. 32-19. Ms. Yara filled the position, but shifted 50-75% of Ms. Wagner's former duties under her own direct supervision, because she agreed with Plaintiff that she had too large a workload to handle. *See* Defs.' Mem., Ex. F 27:22-31:2, ECF No. 23-6. At this point, Ms. Francis Gonzales was Plaintiff's only other employee, and she shared duties between AR and SAVs. *See id.*

In 2009, Plaintiff became ill and was out of work, and when she returned from leave, she had work restrictions based on her doctor's recommendations. *See* Pl.'s Ex. 14 at 50:18-53:24, 59:25-61:17, ECF No. 32-14. In March 2009, Plaintiff told Ms. Yara that she could no longer take on any additional job duties and could not work more than 40 hours a week. *Id.* at 42:21-43:8. Ms. Yara accused her of not wanting to work and wanting to be transferred, which Plaintiff construed as racist comments because of a stereotype that African-Americans are lazy and only want to milk the system. *See id.* at 42:21-43:8, 50:18-54:8.

Plaintiff later received a certified letter dated March 20, 2009, from Cindy Jaramillo, head of Human Resources ("HR"), ordering her to go on FMLA. Pl.'s Resp., UF ¶ 16, ECF No. 32. At that point, Ms. Yara removed all supervisory duties from Plaintiff. *Id.*, UF ¶ 17. Plaintiff went from being a supervisor who managed AR and collection projects and being a part of the

PeopleSoft AR module implementation project and many other major projects, to being assigned to sorting and batching invoices, stuffing envelopes for mailing, and indexing and verifying thousands of invoices and back-up documentation into the computer system. *Id.*

Prior to the time Plaintiff got sick, Ms. Yara had not had a problem with how she worked, when she was gone, or what she did. *See* Pl.'s Ex. 14 at 53:11-24, ECF No. 32-14. After Plaintiff returned with doctor's restrictions, Ms. Yara's demeanor toward Plaintiff changed. *See id.* at 60:23-61:25. Ms. Yara began demanding that Plaintiff turn in P30 forms and list her doctor's appointments. *See id.* On one occasion, Ms. Yara yelled at Plaintiff for not turning in a P30 on time, in an open doorway in front of clerical staff, humiliating Plaintiff. *See id.* at 57:13-58:13.

Gerri Maurino, the AP supervisor at the same E-14 level as Plaintiff, is not an African American. *See id.* at 44:16-25; 48:4-11; Defs.' Ex. F 32:6-18; ECF No. 23-6. Ms. Maurino took a lot of time off to care for an elderly parent, but Ms. Yara did not require her to turn in P30 forms and allowed her to make up the time, without questioning her as to where she had gone. *See* Pl.'s Ex. 14 at 44:16-45:25, ECF No. 32-14; Defs.' Ex. F 32:6-18, ECF No. 23-6. At some point, however, Ms. Yara required Ms. Maurino to turn in P30s because Plaintiff complained. Pl.'s Ex. 14 at 46:5-17, ECF No. 32-14. Ms. Yara also did not speak to Plaintiff, communicating only by email or voice messages, but she spoke to Ms. Maurino and others. *See id.* 46:18-49:15.

When Naydene Castaneda replaced Ms. Maurino as the AP supervisor, Ms. Yara treated her more favorably by allowing her to make up time and not turn in P30 forms and by speaking to her. *See id.* at 47:10-49:15. Ms. Castaneda is not an African American. *See id.* at 49:9-23.

Between June and July 2009, Ms. Yara twice accused Plaintiff of not wanting to work. *See id.* at 50:18-51:12. Plaintiff believed she said that because she was African-American. *See id.*

On or around July 2009, Plaintiff contacted Patricia French, an Executive Board Member

and steward for the union, because she felt like Ms. Yara was racist, did not know what she was doing as a supervisor, and treated her differently from other employees. *See* Pl.'s Ex. 2 12:2-18:2, 20:11-21:16, 35:6-8, ECF No. 32-2. Ms. French set up a meeting with Tanda Meadors, Greg Stricklin, and Plaintiff. *See id.* During the meeting, Plaintiff reported that she felt Ms. Yara was racist, rude, and did not support her. *Id.* at 12:2-16. She told them that she could not take on additional work and needed additional staff. *See id.* at 36:1-11. Ms. Yara came to the meeting later and gave her opinion that Plaintiff was difficult to supervise and was argumentative. *See id.* at 12:2-18:2. They responded having Plaintiff report to Greg Stricklin instead of Ms. Yara. *See id.* Ms. Yara was upset at the result, saying that "Linda had won." *Id.*; Pl.'s Ex. 3, ECF No. 32-3.

On November 4, 2009, Plaintiff received an Interoffice Memorandum from Greg Stricklin, informing her of a scheduled pre-determination hearing to allow her to respond to allegations that she failed to do assigned tasks related to the City's effort to renew contracts that expired with collection agencies. *See* Pl.'s Ex. 21, ECF No. 32-21 at 1 of 5. Leading up to the issuance of the pre-determination letter, Greg Stricklin exchanged emails with upper management, in which Mark Valenzuela, the City's Chief Financial Officer, and others were copied, regarding the language of the letter. *See* Pl.'s Ex. 6, ECF No. 32-6; Pl.'s Ex. 7, ECF No. 32-7; Pl.'s Ex. 8, ECF No. 32-8. On October 30, 2009, Shelley Mund asked Mr. Stricklin by email whether he wanted to include in the letter a falsification or misrepresentation charge based on Plaintiff leading him "to believe the items had been sent out earlier, when they probably had not been." Pl.'s Ex. 7, ECF No. 32-7 at 1 of 2. Mr. Stricklin responded that, although he had "a concern that the contracts were never mailed out when she said they were," he also did not believe he had anything to substantiate that she lied or misled him, because he had not kept on top of the issue and would have to contact the collection agencies or talk to Linda in order to

determine whether she lied to him about when the contracts were mailed. *See id.* Mary Scott and Patricia Miller, however, persuaded Mr. Stricklin to keep the false charge in the pre-determination letter, asserting that it was the hearing officer's responsibility to determine whether there was sufficient evidence to support that Plaintiff made a false statement when she told him that "the Linebarger contract was mailed on October 2nd." *See* Pl.'s Ex. 8, ECF No. 32-8 at 1 of 3. Ms. Miller explained: "If there is no evidence of that particular violation, then the hearing officer will state that in the findings. Please keep in mind that if evidence of false statements is revealed through the process and it has not been included in the predet[ermination] notice, you will not be able to issue a finding or take action." *Id.*

The November 4, 2009 letter informed Plaintiff that the purpose of the hearing was to allow her to respond to the charges. Pl.'s Ex. 21, ECF No. 32-21. Among the rules and regulations cited as "Violations" was section "301.9 False Statements/Fraud," stating that no employee shall willfully conceal any wrongdoing. *Id.* at 3 of 5. Following the November 6, 2009 hearing, in which Plaintiff defended herself, Diane J. Kimberle issued findings and recommendations. *See* Pl.'s Ex. 5, ECF No. 32-5. Ms. Kimberle found that Plaintiff violated certain conditions of employment and duties by failing to bring to Mr. Stricklin's attention the issues she was having getting budget approval and to get his assistance in removing obstacles to get the contracts approved. *See id.* at 5; Pl.'s Ex. 6 at 1-2, ECF No. 32-6. However, Ms. Kimberle concluded that Plaintiff did not violate the false statements/fraud section, although she noted that she found it difficult to believe that none of the five collection agencies received the contracts purportedly mailed to them. *See* Pl.'s Ex. 6 at 3-4, ECF No. 32-6.

On November 25, 2009, after reviewing Ms. Kimberle's findings, Mark Valenzuela advised Plaintiff that she would receive a five working day suspension, without pay, based on

allegations that she failed to complete assignments related to the renewal of the Collection Contracts. *See* Defs.' Mem., UF ¶ 4, ECF No. 23; Defs.' Ex. B, ECF No. 23-2; Pl.'s Ex. 6, ECF No. 32-6 at 1 of 6. The suspension, however, was to be held in abeyance. Defs.' Mem., UF ¶ 4, ECF No. 23. If Plaintiff did not commit a serious infraction of the personnel rules and regulations for six months, the one-week suspension would be reduced to a letter of reprimand that would remain in her personnel file and may be used as a basis for further discipline. *See* Pl.'s Ex. 6, ECF No. 32-6 at 4 of 6. Plaintiff was also directed to attend ERP and purchasing training, and that failure to do so would be seen as insubordination. *See id.* Finally, the ruling stated: "The one (1) work week suspension without pay <u>in abeyance</u> addresses the seriousness of the offenses, but also allows you the opportunity to correct your behavior and address issues and future assignments in a timely fashion, as well as work with supervisors, co-workers, and subordinates to conduct the business of the City of Albuquerque in an efficient and timely fashion and serve the public." *Id.*

In December 2009, Lou Hoffman was appointed Director of Finance for the City. *See* Defs.' Mem., UF ¶ 5, ECF No. 23; Pl.'s Ex. 2 at 18:3-13, ECF No. 32-2. On December 16, 2009, Mr. Hoffman rescinded Plaintiff's scheduled discipline and advised that any references to the same would be expunged from her personnel file. Defs.' Mem., UF ¶ 6, ECF No. 23. The following day, Plaintiff acknowledged receipt of Mr. Hoffman's memorandum. *Id.*

In 2010, the City had cut 200 jobs to try to balance the budget and everybody was short staffed. Pl.'s Ex. 1, 16:25-17:4, ECF No. 32-1. Nevertheless, in February and March 2010, Mr. Hoffman recommended that Laurice Chappell be upgraded from an E-17 to an E-18 section supervisor level, although after visiting with Ms. Chappell, Mr. Stricklin recommended to proceed only with a two-step increase within the E-17 position. *See* Pl.'s Ex. 18, ECF NO. 32-18.

On March 27, 2010, Lou Hoffman assigned Terry Suarez to be the City's Grant Administrator to oversee an Accounting Division Grants Administration Unit where she would assist the City in centralizing its current grant administration function. *See* Pl.'s Ex. 17, ECF No. 32-17. He approved Ms. Suarez, an E18 fiscal manager, for a two-step increase resulting in an hourly pay raise from $39.70 to $43.78. *See id.*

Frances Gonzales needed a duplicate monitor sometime in 2009, but it was taking several months for IT to provide one, so she finally asked Plaintiff for help. *See* Pl.'s Ex. 14 at 59:4-60:22, ECF No. 32-14. In July 2010, Plaintiff contacted the IT person and was facetious about the delay, stating that she would like to get the monitor before she retired. *See id.* On July 28, 2010, the IT person reported to Shalene Andujo, the Senior Administrative Assistant for the Finance Department, in an email that Ms. Allen "expressed concern about this issue being resolved before she retires," and explained that the set-up of the new hardware is something her own department would have to purchase, install, and configure through a city-contracted vendor using their budget. Pl.'s Ex. 15, ECF No. 32-15.

On August 13, 2010, Stephanie Yara was appointed Acting Accounting Officer of the Department of Finance. Defs.' Mem., UF ¶ 7, ECF No. 23. Ms. Yara temporarily became Plaintiff's supervisor again for a few months when Mr. Stricklin resigned unexpectedly, and it took the City some time to replace him with a new director, Pamela Finelli. *See* Pl.'s Ex. 1 11:19-12:10, ECF No. 32-1.[2]

Around that same time, Cindy Jaramillo advised Ms. Yara that anyone in a "critical position" had to be at work during the City's hours of operation from 8:00 a.m. to 5:00 p.m. Defs.' Mem., UF ¶ 8, ECF No. 23. Mr. Hoffman had sent out a department-wide request for this change in hours, in order to treat everyone the same and rectify a collaboration issue in another

---

[2] Jesse Muniz subsequently replaced Ms. Yara as Plaintiff's supervisor. *See* Pl.'s Ex. 2 26:23-27:18, ECF No. 32-2.

division. *See* Pl.'s Ex. 1 14:13-15:1, ECF No. 32-1. On September 14, 2010, Ms. Yara sent an email to Plaintiff and to Ms. Castaneda, requiring them to work from 8 am to 5 pm and to fill out a P-30 form to account for any time absent, excluding their lunch hours. Defs.' Mem., UF ¶ 8, ECF No. 23; Defs.' Ex. G, ECF No. 23-7. Ms. Yara wanted Plaintiff to work City hours because there was a service desk to cover, and there was only one other employee besides Plaintiff that covered the desk. *See* Defs.' Ex. F 38:9-41:18, ECF No. 23-6. Plaintiff refused the request, insisting she remain on her 7:00 a.m. to 4:00 p.m. schedule because of her appointments. *Id.* 38:9-40:21. Another employee in the accounting division, an administrative assistant who did not have to operate a service desk, was permitted a flexible schedule, and some other employees outside the accounting division also were permitted a flexible schedule. *See id.* 38:9-39:5.

In September 2010, Plaintiff once again contacted Patricia French, her union representative, to complain about Ms. Yara being returned as her supervisor and treating her in a racist manner. *See* Pl.'s Resp., UF ¶ 26, ECF No. 32; Pl.'s Ex. 2 at 18:3-19:12, ECF No. 32-2. On September 17, 2010, Plaintiff and Ms. French met with Mr. Hoffman and Ms. Jaramillo. Pl.'s Resp., UF ¶ 27, ECF No. 32; Pl.'s Ex. 2 at 18:3-19:12, ECF No. 32-2; Pl.'s Ex. 4, ECF No. 32-4. During the meeting, Plaintiff told Mr. Hoffman that Ms. Yara was racist and detailed her prior problems with Ms. Yara. *See* Pl.'s Resp., UF ¶ 27, ECF No. 32; Pl.'s Ex. 2 at 18:3-19:12, ECF No. 32-2; Pl.'s Ex. 4, ECF No. 32-4. Plaintiff also complained that she had not received a pay raise, despite that she single-handedly implemented collections, she had written the contract for all city departments to implement a collection process, and that she had worked outside her classification. *See* Pl.'s Resp., UF ¶ 27, ECF No. 32; Pl.'s Ex. 2 at 18:3-19:12, ECF No. 32-2; Pl.'s Ex. 4, ECF No. 32-4; Defs.' Ex. U 30:16-31:22, ECF No. 23-21. She noted that several males had been given raises for working outside their job classification. *See* Pl.'s Resp., UF ¶ 27,

ECF No. 32; Pl.'s Ex. 2 at 18:3-19:12, ECF No. 32-2; Pl.'s Ex. 4, ECF No. 32-4. During the

meeting, Mr. Hoffman asked Ms. Jaramillo if a desk audit had been done, and told her to make

sure that it got done. *See* Pl.'s Resp., UF ¶ 27, ECF No. 32; Pl.'s Ex. 2 at 18:3-19:12, ECF No.

32-2; Pl.'s Ex. 4, ECF No. 32-4; Pl.'s Ex. 1 at 20:24-24:1, ECF NO. 32-1. He had the desk audit

conducted based on Plaintiff's allegation that she was getting paid less than similarly situated

non-African Americans. *See* Pl.'s Ex. 1 at 22:8-22, ECF No. 32-1.

On September 21, 2010, Plaintiff informed Ms. Yara that she was leaving at 1:00 p.m. for

a doctor's appointment. Defs.' Mem., UF ¶ 10, ECF No. 23. Six days later, Ms. Yara requested

that Plaintiff turn in a P-30 form for the leave she had taken. *Id.*, UF ¶ 11. Plaintiff responded by

email stating that she had several appointments that could not be changed without affecting her

treatment plan, that it took more than six months to get her educational classes and appointment

schedule worked out, "so it cannot be changed on someone's whim." Defs.' Ex. K, ECF No. 23-

11. The email also informed Ms. Yara that Plaintiff would continue to leave work at 4 p.m. for

either her classes or appointments. *Id.* Plaintiff met with Ms. Yara and Ms. Jaramillo later that

day, and when told she needed to complete the P30 form, Plaintiff responded that she was in the

middle of something, but would turn it in after a phone call. *See* Defs.' Ex. L, ECF No. 23-12.

On September 27, 2010, Ms. Yara sent an email to Cindy Jaramillo and Michael Garcia,

forwarding the email from the IT person regarding the duplicate monitor issue and stating that

she forwarded the email based on their earlier conversation, but the email is vague as to the

conflict with Plaintiff, and noting that she looked for other emails regarding complaints about

Plaintiff, "couldn't find anything else useful." Pl.'s Ex. 15, ECF No. 32-15.

On October 1, 2010, Plaintiff sent an email to her supervisors indicating that her work

schedule was dictated by her medical condition and requesting as a reasonable accommodation

that she be allowed to return to a 7:00-4:00 schedule. Defs.' Mem., UF ¶ 14, ECF No. 23.

On October 27, 2010, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination on the basis of race, sex, age, disability, and equal pay from January 1, 2007 through October 25, 2010. Defs.' Ex. N, ECF No. 23-14. Plaintiff alleged that, since her promotion to AR Supervisor in January 2007, she has never received a raise even though other similarly situated non-Black supervisors have, and that since August 2010, her new acting supervisor has treated her differently from other non-Black supervisors, including changing her hours, demeaning her in front of coworkers and peers, making rude comments, requiring she report her time and communicate with her supervisor by email, and taking away 60% of personnel in her section without any backfill. *Id.* Plaintiff further alleged that she was only two years from retirement and believed they were trying to force her out of her job by overloading her with work and treating her will little to no respect. *Id.* Moreover, she asserted that on September 14, 2010, her supervisor quit honoring the restrictions she had been on for several years due to her disability. *Id.* Plaintiff subsequently amended her charge to exclude her charges of discrimination based on age and equal pay, *see id.*, but on October 29, 2010, Plaintiff re-added the age and equal pay claims, *see* Defs.' Ex. O, ECF No. 23-15. On March 10, 2011, Plaintiff advised James Snyder, EEOC investigator, that "my ADA issues were addressed by the City of Albuquerque and therefore no further action is required." Defs.' Mem., UF ¶ 18, ECF No. 23.

On November 4, 2010, Mr. Hoffman received an email recommending that under Title I of the Americans with Disabilities Act, Plaintiff should be given a reasonable accommodation in the form of a return to her 7 a.m.-4 p.m. schedule to attend doctor's appointments. Pl.'s Ex. 16, ECF No. 32-16 at 1-2 of 2. Mr. Hoffman sent an email to Mary Scott on November 8, 2010,

11

asking whether Plaintiff had a medical necessity to take leave every Tuesday afternoon. *See id.* Mr. Hoffman sent an email to Eugene Moser noting that Plaintiff's schedule posed a problem because they needed her to work the City's normal hours to deal with the public and supervise her subordinate who worked 8 a.m.-5 p.m., and asking if they would we be justified in assigning her to a position that was not time sensitive. *Id.*

On December 16, 2010, Ms. Yara replied to an email from Ms. Jaramillo who requested responses to allegations made by Ms. Allen. *See* Pl.'s Ex. 19, ECF No. 32-19. Ms. Yara admitted that Plaintiff several times had complained about not receiving additional money for working outside her job description to her and to Greg Stricklin, but stated her opinion that she did not feel that Plaintiff's job performance warranted a raise and never took the issue further. *See id.*

On or about June 13, 2011, Pamela Fanelli, one of Plaintiff's supervisors, approved Plaintiff's submission for a position classification review. *See* Defs.' Mem., UF ¶ 19, ECF No. 23. On August 22, 2011, Vincent A. Yermal, the HR Director, informed Plaintiff that, after the classification review, the City, beginning September 10, 2011, would change her position from non-bargaining Fiscal Analyst, grade E14, step 2, with an hourly salary rate of $19.18, and $85.00 per pay period longevity to bargaining Accounts Receivable Coordinator, grade M14, step 3, with hourly salary rate of $20.71, and $125.00 per pay period longevity. *See* Defs.' Ex. R, ECF No. 23-18. This transfer into a different pay plan conformed to the City policy that stated, "Employees transferring to a position in a different pay plan will be moved to the same or closest higher rate of pay within the new pay plan. . . . The employee will be placed in the closest highest step of the new grade." *See* Pl.'s Ex. 9, ECF No. 32-9. The "M" series was for management, and due to the nature of her job duties, the City placed her in a unionized job. *See* Pl.'s Ex. A 23:13-22, ECF No. 32-1.

12

On December 21, 2011, Jesse Muniz, Assistant Accounting Manager, sent a notice to Plaintiff, stating "[t]his memorandum serves as a Letter of Instruction regarding a phone call you had with representatives of CreditWatch Services, LTD, a contracted vendor with the City of Albuquerque." Defs.' Ex. S, ECF No. 23-19. The memorandum asserted that her actions in the phone call between her and a CreditWatch employee violated City rules and regulations regarding professionalism. *See id.* In a December 29, 2011 memorandum, Mr. Muniz noted he had a meeting with Plaintiff on December 23, 2011, "regarding presentation of a letter of instruction." Pl.'s Ex. 13, ECF No. 32-13. In January 2012, Plaintiff was asked to write a written response to the letter of instruction, but she never did so. Defs.' Ex. U 80:3-9, ECF No. 23-21.

On January 9, 2012, Plaintiff filed another Charge of Discrimination with the EEOC for "retaliation." *See* Defs.' Ex. T, ECF No. 23-20. Plaintiff alleged that on December 13, 2011, the NAACP filed a discrimination lawsuit against the City, and on December 22, 2011, the City retaliated against her for that lawsuit by giving her a letter of reprimand regarding a vendor she works with, without the City having spoken to her or given her a chance to defend herself. *Id.*

By memorandum dated February 6, 2012, Mr. Muniz informed Plaintiff:

The Letter of Instruction from December 21, 2011 was presented in a draft format and not yet finalized. The intent of the document was to obtain your response to the complaint made by a third party vendor that was outlined. We, as a management team, felt the allegations noted were of a nature that warranted documentation. A conclusion or decision on the issue had not been reached….

Defs.' Ex. V, ECF No. 23-22.

On April 20, 2012, Ms. Jaramillo sent an email advising that Leola Sena would be administratively transferred to replace Frances Gonzales. Defs.' Mem., UF ¶ 25, ECF No. 23. Ms. Sena began having problems with Plaintiff's supervision, and on November 9, 2012, she sent an email to Mr. Muniz, Ms. Fanelli, and Ms. Jaramillo to request that a third party be

available for her daily meetings with Plaintiff to document some of Plaintiff's objectionable behavior. *Id.*, UF ¶ 26; Defs.' Ex. X, ECF No. 23-24. Ms. Sena's complaints included: (1) not allowing Ms. Sena to make any personal calls while Plaintiff did so regularly; (2) forbidding Ms. Sena to sit at her desk during the lunch hour; (3) insisting that Ms. Sena always keep objects on her desk in the same positions; (4) hitting Ms. Sena with her purse; (5) slamming the door in her face; (6) and advising Ms. Sena that Plaintiff would not retire until the City paid her off so that she could purchase a home. Defs.' Mem., UF ¶ 26, ECF No. 23; Defs.' Ex. X, ECF No. 23-24.

On November 12, 2012, Mr. Muniz sent Plaintiff an email regarding Ms. Sena's complaints. *See* Defs.' Mem., UF ¶ 28, ECF No. 23; Defs.' Ex. AA, ECF No. 23-27. Mr. Muniz advised that he would not implement restrictions sought by Plaintiff regarding Ms. Sena, such as restricting Ms. Sena's cell phone use to breaks and lunch; restricting her from sitting at her desk at breaks and lunch; requiring a daily log of an hours' worth of documentation of daily tasks; or requiring Ms. Sena to meet with Plaintiff daily; instead requiring a weekly meeting between Mr. Muniz, Plaintiff, and Ms. Sena.  *See* Defs.' Mem., UF ¶ 28, ECF No. 23; Defs.' Ex. AA, ECF No. 23-27. In response, Plaintiff complained to Ms. Jaramillo that Mr. Muniz was taking away her ability to supervise Ms. Sena in violation of City rules and regulations and the Clerical Union Contract. *See* Defs.' Mem., UF ¶ 28, ECF No. 23; Defs.' Ex. AA, ECF No. 23-27.

On January 22, 2013, the Department of Justice ("DOJ") issued its Notice of Right to Sue Letter for the charges filed on October 27, 2010, and October 29, 2010, notifying her that suit must be filed within 90 days of her receipt of the Notice. *See* Defs.' Ex. CC, ECF No. 23-29; Defs.' Ex. N, ECF No. 23-14; Defs.' Ex. O, ECF No. 23-15.

On January 24, 2013, Ms. Sena complained about another incident with Plaintiff, so Mr. Muniz formally requested mediation between the two. Defs.' Mem., UF ¶ 32, ECF No. 23. On

January 29, 2013, Ms. Sena sent her supervisors an email stating the AR Department was a "hostile work environment." Defs.' Ex. FF, ECF No. 23-32. On February 1, 2013, Plaintiff drafted a Notice of Investigation regarding Ms. Sena, notifying Mr. Muniz that she did not feel safe in the workplace because of her conflict with Ms. Sena. Defs.' Mem., UF ¶ 34, ECF No. 23. Later that day, Mr. Muniz advised Plaintiff that he would not send Plaintiff's notice to Ms. Sena, but would instead have Ms. Sena report to an office on another floor and wait to see if the issue could be resolved via mediation the following week. *Id.*, UF ¶ 35.

Two mediation sessions occurred. *Id.*, UF ¶ 37. On February 21, 2013, Ms. Jaramillo advised Plaintiff that she needed specific facts regarding Ms. Sena's alleged threats before further action could be taken. *Id.* On February 27, 2013, Ms. Fanelli and Mr. Muniz met with Plaintiff to discuss another complaint by Plaintiff regarding Ms. Sena, specifically that Ms. Sena was twice disrespectful to Plaintiff when she tried to instruct Ms. Sena not to fold invoices, which she had done against Plaintiff's wishes. *See* Defs.' Ex. KK, ECF No. 23-37; Defs.' Mem., UF ¶ 38, ECF No. 23. Plaintiff was advised she should not be so controlling and that Ms. Sena should not be disrespectful. Defs.' Mem., UF ¶ 38, ECF No. 23.

On April 24, 2013, the DOJ sent a second Notice of Right to Sue letter regarding the October 27, 2010, and October 29, 2010 charges to the purported address of Plaintiff's attorney at 118 Wellesley Drive. *See* Pl.'s Ex. 22, ECF No. 32-22. The DOJ stated that the Post Office had informed it that the initial January 22, 2013 Notice of Right to Sue letter was returned unclaimed. *See id.*

On August 20, 2013, the DOJ issued its Notice of Right to Sue letter with regard to Plaintiff's January 9, 2012 EEOC retaliation charge. *See* Defs.' Mem., UF ¶ 39, ECF No. 23; Defs.' Ex. T, ECF No. 23-20; Defs.' Ex. LL, ECF No. 23-38. Plaintiff and her counsel did not

receive notice of either right to sue letter until sometime after August 20, 2013.[3] On October 1, 2013, Plaintiff filed a complaint for damages, alleging race discrimination under 42 U.S.C. § 1981 (Count I), violation of equal protection under 42 U.S.C. § 1993 (Count II), breach of contract (Count III), and retaliation in violation of Title VII (Count IV).

In February 2014, Ms. Fanelli told Plaintiff that Ms. Sena's attitude was not acceptable and that she had to respect Plaintiff's position. *See* Defs.'s Ex. U 82:23-83:5, ECF No. 23-21. On July 31, 2014, Plaintiff complained to Ms. Fanelli that she was still having problems with Ms. Sena. Defs.' Mem., UF ¶ 42, ECF No. 23. That same day, Ms. Fanelli responded that the situation between Plaintiff and Ms. Sena had not improved, and that Ms. Sena would remain on the 8th floor. *Id.* Based on Plaintiff's complaints about Ms. Sena, on September 8, 2014, the City removed Ms. Sena from Plaintiff's supervision and replaced her that same day with Angel Gonzalez, someone whom Plaintiff considers a friend. Defs.' Mem., UF ¶ 44, ECF No. 23.

## II.   STANDARD

On a motion for summary judgment, the moving party initially bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the

---

[3] Plaintiff's counsel, Mr. Orton, asserts as a fact, without attaching a supporting affidavit, that he has not been at the 118 Wellesley address since May 2010, that any forwarding orders had expired in 2011, and that the DOJ sent out a third right to sue letter on August 20, 2013. *See* Pl.'s Resp. 3, ECF No. 32. Plaintiff cites Plaintiff's Exhibit 22 as support, but Exhibit 22 does not include any documentation showing that the DOJ sent a third right-to-sue letter. Rather the only August 20, 2013 letter in evidence before the Court shows that the right-to-sue letter was for the EEOC retaliation charge submitted on January 9, 2012, regarding the NAACP lawsuit. *See* Defs.' Mem., UF ¶ 39; Defs.' Ex. T, ECF No. 23-20; Defs.' Ex. LL, ECF No. 23-38. The August 20, 2013 letter was sent to Mr. Orton's new address. *See* Defs.' Ex. LL, ECF No. 23-38. Construing the evidence in the light most favorable to the Plaintiff, the Court finds that Plaintiff's counsel did not receive notice that the EEOC had issued right-to-sue letters on his client's charges until after the August 20, 2013 letter was mailed to him at the correct address.

pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (internal quotations omitted). Under Rule 56(c), only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See id.* at 248.

### III.   ANALYSIS

#### A.   Race Discrimination under Section 1981 (Count I)

Plaintiff alleges that Defendant "discriminated and retaliated against" her because of her race. Compl. ¶ 68, ECF No. 2. She asserts that other non-African Americans were treated better, given raises, allowed to hire, and were not disciplined. *Id.* ¶ 69.

##### 1.   Disparate Treatment

Section 1981 "prohibits racial discrimination in the making and enforcement of private contracts." *Runyon v. McCrary*, 427 U.S. 160, 168 (1976). 42 U.S.C. § 1981. A plaintiff must establish intentional discrimination through either direct or circumstantial evidence. *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000). Direct evidence is "proof of an existing policy which itself constitutes discrimination," *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1477 (10th Cir. 1996), or "oral or written statements on the part of a defendant showing a discriminatory motivation," *Kendrick*, 220 F.3d at 1225. In this case, Plaintiff has not presented direct evidence of discrimination.

17

In the absence of direct evidence of discrimination, courts use a three-part burden-shifting framework for evaluating disparate treatment claims under Title VII and Section 1981. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Crowe v. ADT Sec. Servs. Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011). To establish a prima facie case of race discrimination, a plaintiff must show that (1) she is a member of a racial minority, (2) she suffered an adverse employment action, and (3) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *Hysten v. Burlington Northern and Santa Fe Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002).

Adverse employment actions include acts that constitute "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1268 (10th Cir. 2005) (quoting *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998)). The Tenth Circuit liberally interprets the adverse action prong, and courts must examine the unique factors relevant to each case. *Id.* Mere inconveniences or alterations of job responsibilities are not sufficient. *Id.* The Tenth Circuit excludes from the definition "those acts that merely have a *de minimis* impact upon an employee's future job opportunities." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1033 (10th Cir. 2004).

Ordinarily, a plaintiff can satisfy the third prong by showing that the employer treated similarly situated employees more favorably, but courts must be sensitive to the myriad ways a plaintiff may prove the inference. *See Hysten*, 296 F.3d at 1181. "A plaintiff wishing to prove discriminatory animus with evidence that his employer treated him differently from other employees bears the burden of showing that the comparison is legally relevant—i.e., that the employees were similarly situated." *Id.* at 1182.

If a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to offer a non-discriminatory rationale for the adverse employment action. *Crowe*, 649 F.3d at 1194-95.  If the defendant meets its burden, the plaintiff must show that the defendant's proffered rationale is pretextual. *Id.* at 1195.   Pretext can be shown through evidence of weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered reasons that a reasonable jury could rationally find to be unworthy of credence; through direct evidence that the proffered reason is false; through evidence that the employer acted contrary to a policy or practice when making the adverse employment decision; or through evidence that plaintiff was treated differently from similarly-situated employees. *See id.* at 1196; *Kendrick*, 220 F.3d at 1230. The court does "not ask whether the employer's reasons were wise, fair or correct; the relevant inquiry is whether the employer honestly believed its reasons and acted in good faith upon them." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118-19 (10th Cir. 2007).

Defendants contend that Plaintiff cannot establish that she suffered an adverse employment action or that any such action occurred under circumstances giving rise to an inference of discrimination. Plaintiff asserts that she suffered adverse employment actions when she was denied a re-classification for five years, when she received the November 25, 2009 discipline letter and five-day suspension held in abeyance, when the City issued her the December 21, 2011 letter of instruction, and when management supported Ms. Sena for two years creating a severe and hostile work environment for Plaintiff.[4]

### a.      Disparate pay

---

[4] In the section of her response on whether she has sufficient evidence to support an inference of discrimination, Plaintiff asserts that she had to submit P-30 forms while other similarly situated non-African American employees did not. It is unclear whether Plaintiff is contending that the submission of the forms amounts to an adverse action, but to the extent that she is, the Court disagrees. Cf. Sanchez, 164 F.3d at 533 (holding that requiring plaintiff, and no other teachers, to bring doctor's note when she was sick and threatening to put plaintiff on plan for improvement did not rise to level of materially adverse employment action). The Court, however, will consider that evidence when determining whether it supports an inference of racial discrimination.

Defendants contend that Plaintiff suffered no adverse employment action with regard to reclassification and pay raises, because it is undisputed that Plaintiff, after complaining of not getting a raise, ultimately received a reclassification from an E-14 to an M-14 with an increase in hourly pay. The failure to give a raise constitutes an adverse action, as it adversely affects an employee's compensation and benefits. *See Dick*, 397 F.3d at 1268 ("An adverse employment action includes acts that constitute [ ] a significant change in employment status, such as … failing to promote ….") (internal quotations omitted). Although the reclassification positively changed her compensation,[5] the evidence shows that she complained to her supervisors several times that she deserved a reclassification to account for her greater duties, yet Ms. Yara never took action on the requests because she did not believe Plaintiff's performance warranted a raise. *See* Pl.'s Ex. 19 at 2, ECF No. 32-19; Defs.' Ex. F 26:9-27:18, ECF No. 23-6. The failure to act on Plaintiff's initial requests for a pay raise effectively amounted to a denial of her pay raise request. The initial denial of the reclassification of her position would have resulted in diminished benefits throughout the timeframe of when the initial request should have been granted until the time her subsequent request was granted and she received a pay raise. Consequently, contrary to Defendants' argument, the fact that she ultimately received the reclassification does not itself establish that she did not suffer an adverse action.

Defendants additionally argue that Plaintiff cannot show that their failure to give her a pay raise occurred under circumstances giving rise to an inference of discrimination. They contend that Plaintiff was not able to specify any non-African American employees who had the same supervisor and received reclassifications and pay raises.

Plaintiff presented evidence that the following non-African Americans were paid more than she was or received pay raises under Mr. Hoffman's supervision: Terry Suarez, Laurice

---

[5] The Court disagrees with Plaintiff's argument that the reclassification from an E14 to an M14 is not a raise.

Chappell, Ann Chavez, Danny Naverrez, and "Rob Dunn or Ron Dunn." *See* Defs.' Ex. U at 32:3-39:6, ECF No. 23-21; Pl.'s Resp. 17, ECF No. 32. Effective March 27, 2010, Mr. Hoffman approved a two-step raise for Terry Suarez, an E18 Fiscal Manager, as compensation for her increased duties when she was assigned to monitor and train City personnel involved in the management of federal, state, and local grants. *See* Pl.'s Ex. 17, ECF No. 32-17. Ms. Suarez, unlike Plaintiff, was a CPA and in charge of the budget for the entire department of finance, she got a raise along with her transfer, and she was supervised directly by Mr. Hoffman, and then Ms. Fanelli. *See* Defs.' Ex. U 34:14-36:13, ECF No. 23-21. On or around March 2010, Mr. Hoffman recommended giving Laurice Chappell, then at an E17 position, a two-step increase. *See* Pl.'s Ex. 18, ECF No. 32-18. Ms. Chappell was a payroll manager supervised by Ms. Yara who oversaw payroll for the City and was in a position higher than the one Plaintiff held. *See* Defs.' Ex. U 36:14-37:8. As for Ann Chavez, Plaintiff did not know her position, educational background, or prior work experience, and admitted that Ms. Chavez did not have the same job duties, was at a lower grade, and had a different direct supervisor. *See id.* at 32:3-33:25, 35:23-36:4, ECF No. 23-21. Plaintiff did not know anything about Mr. Naverrez's job, who his supervisor was, or what his educational background and work experience were. *See id.* at 37:9-23. Plaintiff only knew that Mr. Dunn worked in environmental health. *See id.* at 38:2-39:1. Based on this record, Plaintiff has not met her burden of showing that these employees who received raises were similarly situated to her. *Cf. Block v. Kwal-Howells, Inc.*, 92 F. App'x 657, 660-61 (10th Cir. Feb. 17, 2004) (holding that plaintiff failed to establish that higher-paid male employee was similarly situated to her where they had different backgrounds, levels of experience, and knowledge of positions, and positions entailed different types of work); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1363 (10th Cir. 1997) (concluding plaintiff failed to

show she was similarly situated to higher paid male managers when they worked in different departments, had greater experience, and a greater array of responsibilities).[6]

Nevertheless, the Tenth Circuit has made clear that an inference of discrimination based on race may be created in "myriad" other ways. *See Hysten*, 296 F.3d at 1181. In a failure to give a pay raise case, a plaintiff may make a prima facie case by showing that there were promotional opportunities available, she was qualified for the promotion, and despite her qualifications she was not promoted. *See Sprague*, 129 F.3d at 1362 (analyzing similar elements in sex discrimination case based on failure to promote). The record shows that a reclassification of her position was an available tool to give Plaintiff a pay raise to account for her greater duties; Plaintiff was qualified for the reclassification, as evidenced by the fact that she ultimately received the reclassification; and yet, Plaintiff's initial requests for a pay raise were denied. This evidence is sufficient to raise an inference of discrimination, if unexplained, because it eliminates the most common legitimate justifications for failing to promote – the lack of availability of a pay raise/promotional opportunity or the lack of qualification. *Cf. Hysten*, 296 F.3d at 1181-82 ("Proof that a qualified individual in a protected class was discharged and that his position remained open after the discharge raises an inference of discrimination because it eliminates the two most common legitimate justifications for discharge—lack of qualification and elimination of a position.").

Although this Court concludes that the initial denials of Plaintiff's pay raise requests constitute an actionable adverse employment action, for the reasons discussed *infra* in Section III(A)(2), Defendants are entitled to summary judgment on this claim because it falls outside the

---

[6] To the extent Plaintiff argues that she should have been paid more than she received from her September 2011 reclassification, Defendants are entitled to summary judgment because Plaintiff has not shown evidence of similarly situated employees who were paid more than the amount she received. Nor has Plaintiff presented other admissible evidence to create a genuine issue of fact that she deserved a greater pay raise than she received in September 2011.

statute of limitations.

    b.    **November 25, 2009 Suspension Warning**

Plaintiff additionally argues that the November 25, 2009 letter announcing a five-day suspension amounts to an adverse action against her. Defendants contend that, because the suspension was rescinded and expunged from her file, it does not amount to an adverse action.

"Actions such as suspensions or terminations are by their nature adverse, even if subsequently withdrawn." *Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998). Employer actions that can have an adverse impact on future employment opportunities, such as warnings that can be used to support future terminations for further infractions, constitute adverse employment actions. *See id.*

In this case, the November 25, 2009 letter announced the imposition against Plaintiff of a five work-day suspension without pay to be held in abeyance. Pl.'s Ex. 6 at 4, ECF No. 32-6. If Plaintiff did not commit a serious infraction of the rules for six months, the suspension would be reduced to a letter of reprimand that would remain in her file to be used as a basis for further discipline. *Id.* If she committed another serious infraction, the suspension without pay would be immediately imposed. *Id.* Had the suspension ultimately been implemented, the Court would agree with Plaintiff that she suffered an adverse employment action.

In this case, however, Mr. Hoffman, upon coming in as part of the new City administration and reviewing the letter, rescinded it and expunged all references to it in Plaintiff's personnel file. Plaintiff was thus never suspended and no letter was placed in her personnel file that could be used to harm her future employment opportunities. Although the November 25, 2009 letter could have been used to harm her employment opportunities for the 22 days it was in her file should she have committed another infraction, no harm in fact occurred to

Plaintiff during that time because she committed no other serious infraction. An unsubstantiated threat of future harm, alone, is not sufficient to constitute an adverse employment action unless there is evidence that the warning had an impact on the employee's employment status. *Cf. Medina v. Income Support Div.*, *New Mexico*, 413 F.3d 1131, 1137 (10th Cir.2005) (holding that warning letter did not constitute adverse employment action where letter was not placed in plaintiff's personnel file and did not and could not adversely affect terms or conditions of plaintiff's employment).

Plaintiff's reliance on the *Roberts* case is unavailing. In that case, within a two year period subsequent to his written complaint of discrimination, the plaintiff received 20 warning letters, two suspensions, and one termination. *See Roberts*, 149 F.3d at 1104. In concluding that he suffered an adverse employment action, the Tenth Circuit noted that suspensions and terminations are adverse, even if subsequently withdrawn. *Id.* The plaintiff in *Roberts*, however, was terminated, and his termination subsequently withdrawn when his employer reinstated him after intervention by his union. *See id.* at 1103.

In contrast, here Defendants never implemented a suspension. Defendants' initial action was a suspension without pay *held in abeyance*, so Plaintiff was never actually suspended, did not miss any work days, and knew she would only lose pay if she committed another "serious infraction." The November 25, 2009 letter essentially carried only the threat of suspension without pay. That threat was remedied 22 days later when the suspension held in abeyance was rescinded and all reference to it expunged. This case is thus more like the Tenth Circuit cases holding that write-ups or written warnings that would not harm an employee's future employment prospects do not constitute adverse actions, rather than the cases in which an employee's suspension or termination was implemented, rescinded, and back wages given.

24

*Compare Tapia v. City of Albuquerque*, 170 F. App'x 529, 532-34 (10th Cir. Feb. 10, 2006) (letter of instruction warning that future disciplinary action was possible if plaintiff made another threat was not an adverse employment action because it did not affect his pay, benefits, or employment status or affect his future employment opportunities); *Medina*, 413 F.3d at 1137 (warning letter fell short of adverse employment action where letter was not placed in personnel file, did not undermine her current position, and could not adversely affect future employment opportunities); *Dick*, 397 F.3d at 1270 (write-up did not constitute adverse action where it had no bearing on likelihood of being fired); *with Green v. Donahoe*, 760 F.3d 1135, 1146-47 (10th Cir. 2014), *cert. granted on other grounds*, 135 S.Ct. 1892 (2015) (holding that emergency placement of employee on "nonpay status" was adverse action necessary to support retaliation claim, even though he never missed a regular paycheck by agreeing to settle with Postal Service, because he may have been induced to accept settlement so that he could be paid and, at time he was handed letter, he did not know that he would be paid, all of which reasonably could dissuade a reasonable worker from making charge of discrimination).[7] Under these circumstances, where the new administration quickly remedied the potential consequences set forth in the letter, the Court finds that the November 25, 2009 letter falls short of an adverse employment action.

### c.      December 21, 2011 letter of instruction

Next, Plaintiff contends that the December 21, 2011 letter of instruction constitutes an adverse employment action. Plaintiff admits, however, that "the courts have ruled that a draft letter that is not put into an employee's file does not normally rise to the level of an adverse

---

[7] *See also Whitfield v. Potter*, No. Civ. 07-650-MSK-MJW, 2008 WL 4527711, at *1-2, 4 & n.5 (D. Colo. Oct. 3, 2008) (holding that, where plaintiff had been placed on "emergency placement," a non-working assignment, but subsequently emergency placement was converted to 7-day "paper suspension," which was implemented solely by memorandum placed in his personnel file, and plaintiff returned to work approximately three months later, receiving reimbursement of salary lost, and later "paper suspension" was rescinded, plaintiff suffered an adverse action, but noting that a recommendation of removal was not an adverse action because it was never implemented in the first place and he never experienced any adverse employment consequences from the un-adopted recommendation).

employment action." Pl.'s Resp. 13, ECF No. 32. Plaintiff nonetheless argues that the draft letter should be considered an adverse action in light of the prior history of false allegations and discipline actions brought against Plaintiff.

For a write-up to constitute an adverse action, the plaintiff must show that the write-up harmed her future employment prospects. *See Dick*, 397 F.3d at 1270. Plaintiff admitted in her deposition that she had no personal knowledge regarding whether or not the letter was placed in her personnel file. Defs.' Ex. U at 106:5-114:20, ECF No. 23-21. Ms. Allen also admitted that no further progressive discipline occurred against her since the letter was given to her, *see id.* at 116:7-18, and there is no dispute that Mr. Muniz informed her by letter dated February 6, 2012, that the December 21, 2011 letter was presented in a draft format, not yet finalized, and was intended to give Plaintiff a chance to respond to the complaint made by the third party vendor, Defs.' Ex. V, ECF No. 23-22. Based on this record, the Court finds that Plaintiff has not met her burden of showing that the December 21, 2011 letter harmed her future employment prospects sufficient to conclude that it constitutes an adverse employment action. *Cf. Medina*, 413 F.3d at 1137 (single warning letter fell short of adverse employment action where letter was not placed in employee's personnel file); *Dick*, 397 F.3d at 1270 ("Ms. Dick alleges only one instance of a disciplinary action. Moreover, she does not allege that the single write-up has any bearing on her likelihood of being fired. On these facts, Ms. Dick has not demonstrated any harm to her future employment prospects.").

As for Plaintiff's argument that this Court should conclude that the draft letter rises to an adverse employment action because of Defendants' history of bringing false allegations against her and using them as a basis for discipline and suspension, Plaintiff cites no authority in support. Moreover, the record refutes Plaintiff's allegation that purportedly false allegations

made against her in November 2009 were used as a basis of discipline. The City alleged that she

had made a false representation to her supervisor to enable the hearing officer to determine at the

pre-determination hearing whether Plaintiff indeed made the false statement regarding the

mailing of the contracts. Her supervisors found it incredible that she had mailed the contracts,

given all five of the vendors never received them. The hearing officer also found Plaintiff's

version difficult to believe, but nonetheless determined that there was insufficient evidence to

establish that she made a false statement. *See* Pl.'s Ex. 6 at 3-4, ECF No. 32-6. In the November

25, 2009 warning letter, Mark Valenzuela acknowledged that the hearing officer had found in

Plaintiff's favor on that issue, and there is nothing to suggest that his proposed discipline relied

on the allegation of the false statement instead of the other violations that hearing officer found

that Plaintiff violated. *See id.* at 1-6.

### d.     Refusal to hire replacement employees

Plaintiff contends that, when her subordinates left her department, she was not allowed to

replace them, resulting in an increased workload for her, and disparate treatment based on her

race. She contends that the resulting increased workload made it difficult for her to do her job

effectively, setting her up for performance issues problems, such as that which occurred when

she failed to send out the contract renewals. The Court does not need to determine whether the

failure to replace her subordinates, and the resulting increased workload, amount to significantly

diminished material responsibilities and an adverse action, because for the reasons discussed in

section III(A)(2), the non-replacement of subordinates constitute discrete acts that occurred

outside the statute of limitations period.

### e.     Hostile work environment based on co-worker hostility

Plaintiff contends that Ms. Sena's hostility and extreme conduct towards Plaintiff, and management's support and encouragement of Ms. Sena and not Plaintiff, amounted to a hostile work environment and adverse employment action. "Coworker hostility or retaliatory harassment may be an 'adverse employment action' if it is sufficiently severe." *Dick*, 397 F.3d at 1269 (citing *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir. 1998) (retaliation claim). A hostile work environment claim, however, requires more than disrespectful, rude, chilly, or otherwise disagreeable behavior. *See Samoza v. Univ. of Denver*, 513 F.3d 1206, 1217-18 (10th Cir. 2008).

No jury could conclude that the complained of conduct by Ms. Sena was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment. Notably, Ms. Sena was junior to Plaintiff, and thus her behavior would not be as objectively intimidating as it would be had she been a superior. *Cf. id.* (holding that conduct was not indicative of pervasively hostile work environment necessary to survive objective test of second prong of prima facie standard for retaliation claim where junior colleague was disrespectful, defensive, disregarding, uncooperative, rude, and disagreeable).

Furthermore, the record contradicts Plaintiff's assertion that management supported Ms. Sena and her hostile conduct against Plaintiff. The City was facing allegations from Ms. Sena that Plaintiff was creating the hostile work environment. When Plaintiff made opposing claims, the City took Plaintiff's complaints about Ms. Sena seriously. The same day Plaintiff said Ms. Sena made her feel unsafe, Mr. Muniz moved Ms. Sena to another floor until mediation might resolve the conflict. When mediation proved unsuccessful and both Ms. Sena and Plaintiff continued to make conflicting claims of harassment against each other, the City made Ms. Sena's move to another floor permanent and replaced her with Angel Gonzalez, a person whom Plaintiff

liked and considered a friend. Rather than acquiescing in or condoning Ms. Sena's behavior, Defendants actively worked to resolve the conflicts between them and moved to alleviate the hostility by separating them. The alleged work site harassment by Ms. Sena thus does not rise to a materially adverse action. *Cf. McGowan v. City of Eufala*, 472 F.3d 736, 743-44 (10th Cir. 2006) ("The record does not support a conclusion that harassment was orchestrated by supervisory personnel or that the City tacitly approved of it. Additionally, many of McGowan's allegations such as her complaints regarding the highlighting of her time slips and French's petty criticism of her work are of a trivial nature and do not rise to a claim of an 'abusive' materially adverse work environment."). Defendants are thus entitled to summary judgment on Plaintiff's racial discrimination claim based on a co-worker hostile work environment theory.

### 2.      Statute of Limitations

The statute of limitations is an affirmative defense, so Defendants, as the moving party, bear the burden of demonstrating that there are no material facts in dispute on whether the statute of limitations bars the claim. *Robert L. Kroenlein Trust ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1274 (10th Cir. 2014). Defendants argue that Plaintiff has no viable cause of action for anything which occurred before October 2, 2009, because the statute of limitations for Section 1981 claims is four years. *See Harris v. Allstate Ins. Co.*, 300 F.3d 1183, 1188-89, 1193 (10th Cir. 2002) (four year statute of limitations applies to claims falling under § 1981(b)). Plaintiff does not dispute that the four-year limitations period applies. Plaintiff instead argues that the discrimination began in 2007 and continued through the present and that her claims are timely because she filed her claims within 90 days of the EEOC's issuance of its right-to-sue letter.

Plaintiff's latter argument applies to the timeliness of a Title VII claim, which must be administratively exhausted before suit is filed. *See Martinez v. Potter*, 347 F.3d 1208, 1210-11

(10th Cir. 2003). Exhaustion of administrative remedies, however, is not required before bringing claims under Section 1981. *See Mitchell v. City and County of Denver*, 112 F. App'x 662, 670 (10th Cir. Oct. 12, 2004). The Court will therefore turn to examining whether the two remaining potentially viable alleged adverse employment actions occurred within the four-year window for Plaintiff to bring Section 1981 claims – the failure to give her a pay raise and failure to hire replacements for her subordinates.

Discrete acts such as termination, failure to promote, or refusal to hire are easy to identify, and thus, constitute separate actionable unlawful employment practices that must occur in the statutory time frame. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). "The limitations period begins on 'the date the employee is notified of an adverse employment decision by the employer.'" *Daniels v. United Parcel Service, Inc.*, 701 F.3d 620, 628 (10th Cir. 2012) (quoting *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1187 (10th Cir. 2003)). *See also Almond v. Unified School Dist. No. 501*, 665 F.3d 1174, 1176 (10th Cir. 2011) ("[T]he clock starts running when the plaintiff first knew or should have known of his injury, whether or not he realized the cause of his injury was unlawful."). "When a complaint alleges multiple discrete acts, the limitations period runs separately for each act." *Daniels*, 701 F.3d at 628. When an employment decision is not announced, the question is when the plaintiff did or a reasonable employee would have known of the employer's decision. *Almond*, 665 F.3d at 1177.

"The continuing violation doctrine allows a plaintiff to recover 'for discriminatory acts that occurred prior to the statutory limitations period if they are part of a continuing policy or practice that includes the act or acts within the statutory period.'" *Daniels*, 701 F.3d at 631-32 (quoting *Davidson*, 337 F.3d at 1183). The Supreme Court, however, has rejected the continuing violation doctrine for claims of multiple discrete acts of discrimination, limiting the doctrine to

only hostile work environment claims. *Id.* at 632 (citing *Morgan*, 536 U.S. at 114).

The Court will thus consider the conduct alleged between October 1, 2009, and October 1, 2013, the date Plaintiff filed her complaint, to determine whether Plaintiff was notified of or had reason to know of the alleged adverse actions within that time frame. *Cf. Mitchell*, 112 Fed. App'x at 670 (explaining that plaintiff's Section 1981 disparate treatment claim is subject to four year statute of limitations and limiting consideration to "the conduct alleged between September 8, 1993, and September 8, 1997, the date [plaintiff] filed his initial complaint").

### a. Failure to give a pay raise

In *Ledbetter v. Goodyear Tire & Rubber Co., Inc.,* 550 U.S. 618 (2007), the Supreme Court held that the statute of limitations begins for a Title VII claim related to discrimination in compensation when the employer makes the discriminatory "pay-setting" decision. *Ledbetter*, 550 U.S. at 621. It concluded that a new violation does not occur, and a new charging period does not commence, when an employer issues each new paycheck on the basis of the past discriminatory decision. *Id.* at 628. The Court noted that statutes of limitations "serve a policy of repose" and represent a legislative judgment that it is unjust to fail to put an adversary on notice to defend within a specified period of time. *Id.* at 630.

Congress responded to the *Ledbetter* decision by passing the Lilly Ledbetter Fair Pay Act of 2009 ("FPA"), which amended several anti-discrimination statutes, including Title VII, to provide that an unlawful employment practice occurs, with respect to discrimination in compensation when (1) a discriminatory compensation decision or other practice is adopted, (2) a plaintiff becomes subject to a discriminatory compensation decision or other practice, or (3) the plaintiff is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid. 42 U.S.C. § 2000e-

5(e)(3)(A); *Almond*, 665 F.3d at 1179-80. The Tenth Circuit has defined "discrimination in compensation" claims subject to the FPA as "situations in which a member of a protected class receives less pay than similarly situated colleagues—that is, unequal pay for equal work." *Almond*, 665 F.3d at 1175. The Tenth Circuit has thus narrowly defined when the FPA applies to those cases in which an employee is alleging a pay disparity between herself and similarly situated employees outside the protected class. *See id.* at 1181.

This Court has determined that Plaintiff has not met her burden on summary judgment to show that she was paid less than non-African Americans doing similar work. Thus, Plaintiff cannot succeed on an unequal compensation claim (unequal pay for equal work), the only type of claim subject to the FPA. *Cf. id.* at 1183-84 (holding that FPA did not save plaintiffs' claims because, although they may have been discriminated against in the transfer decision, they were not discriminated against in compensation). The Court thus concludes that the FPA is not implicated in this case. Instead, Plaintiff's failure to give a pay raise claim amounts to a denial of a promotion claim – a discrete act that accrued when she knew or a reasonable employee would have known that her request for a reclassification was denied.

Defendants have shown that the following events are undisputed: On September 17, 2010, Plaintiff complained to Mr. Hoffman that she was being discriminated against based on her race and that she had not received a pay raise. At that time, Mr. Hoffman told Ms. Jaramillo to make sure a desk audit was done. On June 13, 2011, Ms. Fanelli approved Plaintiff's submission for a position classification review, and on August 22, 2011, the reclassification was approved, effective September 10, 2011. Defendants have thus demonstrated that the request for a pay raise Plaintiff made within the four-year statute of limitations was granted.

Plaintiff has not met her burden of showing a genuine issue of fact exists regarding the

timeliness of her Section 1981 failure to give a pay raise claim. The record does not indicate that the City denied her initial requests for reclassification within the statutory window. Instead, Plaintiff's assertions indicate that the initial request for reclassification occurred sometime in 2007 or 2008. *See* Pl.'s Resp. 4 (asserting that her November 2007 job evaluation resulted in Mr. Stricklin sending Plaintiff a reclassification form) and 16 (noting that initial desk audit had been submitted in 2008), ECF No. 32. Nor is there evidence in the record that Plaintiff was not first made aware of the effective denial(s) of her initial reclassification request(s) until on or after October 1, 2009. Accordingly, the only pay raise request in the record for which a timely Section 1981 claim could be brought is the September 17, 2010 request that the City granted. The Court therefore finds that the Section 1981 denial of a pay raise claim is barred by the four-year statute of limitations as a matter of law.

### b.  Refusal to hire replacements for Plaintiff's subordinates

Generally, "in determining when the limitation period commences, 'the proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful.'" *Brown v. Unified School Dist. 501*, 465 F.3d 1184, 1187 (10th Cir. 2006) (quoting *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980)) (italics in original). "Thus, when an initial discriminatory act is time-barred, a later related event is not actionable if it is merely a consequence of the first; to be actionable, the later event must involve an independent act of discrimination (which in certain circumstances may be inherent in the event, but otherwise requires explicit supporting allegations)." *Id.*

The third of Plaintiff's four employees left her supervision and was not replaced under her supervision in February 2009, outside the four-year statute of limitations period. From February 2009 on, Plaintiff knew that she had only one employee under her supervision.

Although the City did not add subordinates thereafter, each decision not to replace an employee under Plaintiff's supervision is a discrete act, all of which occurred outside the limitations period. Plaintiff's § 1981 claim based on the allegedly adverse action of refusing to replace employees under Plaintiff's supervision is thus barred by the four-year statute of limitations. *Cf. Morgan*, 536 U.S. at 113 ("discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges"); *Daniels*, 701 F.3d at 631-33 (holding that denial of training claim was barred by statute of limitations, even though effects of denial may have been felt during limitations period, because denial of training was discrete act that occurred outside statutory time frame); *Brown*, 465 F.3d at 1187-88 (holding that "employer's mere reiteration of a broad decision not to consider an applicant for any employment does not revive expired objections regarding its initial statement of that decision," and thus, dismissing plaintiff's § 1981 claims as time-barred).

### 3.      Retaliation

Defendants' arguments for awarding them summary judgment on Plaintiff's retaliation claim pertain to Plaintiff's Title VII Retaliation claim asserted in Count IV. As discussed below, the Court agrees that Defendants are entitled to summary judgment on Count IV for reasons unique to Title VII exhaustion. Plaintiff, however, has alleged in Count I, paragraph 68, that she was "discriminated *and retaliated against* starting in November 2006 through the present." Compl. ¶ 68, ECF No. 2 (italics added). Because exhaustion of remedies is not required under Section 1981, *see Mitchell*, 112 F. App'x at 670, the contours of a § 1981 retaliation claim are not confined to the charges in an EEOC complaint, and time-wise are limited only by the four-year statute of limitations. To succeed on a Section 1981 retaliation claim, the plaintiff must show that (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3)

34

there is a causal connection between these two events. *See Duncan v. Manager, Dept. of Safety, City and County of Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005).

An adverse action in a retaliation claim is one in which "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted). "[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 64.

Plaintiff asserts that the November 2009 pre-determination letter against her was in retaliation for her July 2009 informal complaints of race discrimination by Ms. Yara. Because the warning letter that resulted from the November 2009 pre-determination letter was rescinded, the Court concludes that it does not amount to an adverse action under the retaliation standard either. Plaintiff also contends that after she made a second set of complaints against Ms. Yara when Ms. Yara was returned as her supervisor, the City retaliated against her by (1) requiring Plaintiff to submit P-30 forms for absences and to keep track of her time and (2) questioning her FMLA request. *See* Pl.'s Resp. 24, ECF No. 32. These actions do not amount to an adverse employment action because they would not dissuade a reasonable worker from making or supporting a charge of discrimination.

### B.    Equal Protection (Count II)

Defendants argue that they are entitled to summary judgment on Count II, because Plaintiff cannot prove, as she must, that the conduct of a City employee rises to the level of discrimination or that it is representative of an official policy or custom of the institution. Plaintiff responded with arguments of her evidence of discriminatory treatment. *See* Pl.'s Resp.

21-23, ECF No. 23. She failed, however, to address Defendants' argument that she cannot prove that an official policy or custom was the moving force behind the constitutional deprivation.

To succeed on a Section 1983 Equal Protection claim against a municipal entity, the plaintiff must prove both (1) that a City employee violated her rights under the Equal Protection Clause, and (2) that an official policy or custom was the moving force behind the constitutional deprivation. *See Myers v. Oklahoma County Bd. of County Com'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998). Plaintiff alleged in her Complaint that the City failed adequately to train or supervise its workforce in anti-discrimination activities, and that it had a pattern of singling out African Americans for improper treatment. *See* Compl. ¶¶ 76-79, ECF No. 2. Plaintiff, however, has not set forth what evidence she has to support her municipal liability theory based on failure to train or supervise or a pattern or practice of discriminatory treatment. The Court will therefore grant Defendants summary judgment on Plaintiff's Section 1983 Equal Protection claim. *Cf. Mitchell*, 112 F. App'x at 671-73 (discussing requirements for showing municipal policy in § 1983 claims and holding that plaintiff failed to show municipal policy or custom caused discrimination).

### C.    Breach of Contract (Count III)

Defendants argue they are entitled to summary judgment on Plaintiff's breach of contract claim because there is no applicable precedent supporting Plaintiff's position that discriminatory conduct can constitute a contractual breach under the facts of this case. Plaintiff responds that Defendants breached the City's Rules and Regulations by "only giving the Plaintiff two days to reply to a Pre-determination letter and submitting false and malicious accusations in the Pre-determination letter and subsequent disciplinary report in violation of the Defendants Rules concerning disciplinary procedure, Rule 301. Standard of Conduct requiring an Employee to

maintain professional standards and Rule 301.9 False Statements/Fraud ….” Pl.’s Resp. 25, ECF No. 32.

To prevail on a breach of contract claim, Plaintiffs are required to prove a valid contract, breach of the contract, and damages caused by the breach. *See Constr. Contracting & Mgmt., Inc. v. McConnell*, 1991-NMSC-066, ¶ 10, 815 P.2d 1161. Plaintiff has not submitted evidence of a rule or regulation that contractually bound the City to provide more than two days to reply to a pre-determination letter. Plaintiff thus has not met her burden on summary judgment of proving breach of contract as to the notice argument. Furthermore, Plaintiff has not proven that any damages resulted from any such breach. The City ultimately rescinded the discipline that resulted from the hearing for which she claims insufficient notice.

As for Plaintiff’s breach of contract claim based on making false and malicious statements against her, Plaintiff relies on Rules 301.3 and 301.9 of the City’s Personnel Rules and Regulations. Rule 301.3 states that employees must “maintain their conduct at the highest personal and professional standards in order to promote public confidence and trust in the City….” Pl.’s Ex. 5, ECF No. 32-5 at 3 of 5.[8] Rule 301.9 provides: “No employee shall willfully make any false statement . . . in regard to any … investigation ….” *Id.* These provisions set forth the duties of the employees when performing actions on behalf of the City. They do not appear to set forth the obligations of the City. Plaintiff has not provided the Court with any authority holding that a claim for breach of contract against the City could be premised on a violation of such rules. Even if the cited rules could support a breach of contract claim against the City, based on the record, no reasonable jury could find that the City breached Rule 301.3 or Rule 301.9 when it included a false statement/fraud charge in its pre-determination letter in order to allow

---

[8] Plaintiff has not submitted the rules themselves, but has submitted the City’s findings and recommendations, which contain reference to the rules. *See, e.g.*, Pl.’s Ex. 5, ECF No. 32-5 at 3 of 5. Defendants have not objected to the Court’s consideration of these rules based on hearsay or any other rule of evidence.

the hearing officer to determine whether Plaintiff made a false statement when she told Mr. Stricklin that the Linebarger contract was mailed on October 2, 2009. The Court therefore concludes that summary judgment should be granted to Defendants on Plaintiff's claim for breach of contract.

### D.      Violation of Title VII – Retaliation (Count IV)

Defendants argue that the "only actionable Title VII claim plaintiff arguably has is with regard to her Charge No. 543-2012-00538," in which she alleged that the City retaliated against her for the NAACP filing a lawsuit against the City by giving Plaintiff the December 22, 2011 letter of reprimand. Plaintiff contends that the 2012 EEOC filing is not the only event from which her claim of retaliation stems. Plaintiff asserts she complained in July 2009 about race discrimination, resulting in the November 2009 pre-determination letter against her, and that she was retaliated against for complaining to the union about Ms. Yara being returned as her supervisor by having to submit P30 forms and having her FMLA questioned.

In Count IV, Plaintiff clearly alleges a claim of "Violation of Title VII – Retaliation." Compl. 15, ECF No. 2. "Federal courts lack jurisdiction over Title VII claims that were not previously covered in a claim presented to the Equal Employment Opportunity Commission." *Eisenhour v. Weber County*, 744 F.3d 1220, 1226 (10th Cir. 2014) (citing *Shikles v. Sprint/United Mgmt Co.*, 426 F.3d 1304, 1317 (10th Cir.2005)). "[F]ederal courts lack jurisdiction over incidents occurring after the filing of an EEOC claim unless the plaintiff files a new EEOC claim or otherwise amends her original EEOC claim to add the new incidents." *Id.* at 1227.

Plaintiff filed her first EEOC complaint in October 27, 2010, alleging race, sex, and disability discrimination. *See* Defs.' Ex. N, ECF No. 23-14. The retaliation box was not checked

and none of her allegations mentioned or suggested retaliation. *See id.* Plaintiff amended that complaint two days later to allege discrimination based on age and a claim of sex discrimination under the Equal Pay Act. Defs.' Ex. O, ECF NO. 23-15. The retaliation box was again not checked. *See id.* On January 9, 2012, Plaintiff made another EEOC Complaint, this time clearly marking the "Retaliation" box and alleging that she was retaliated against on December 22, 2011, when she was given a letter of reprimand regarding a vendor she worked with, in retaliation for the NAACP filing a discrimination lawsuit against the City on December 13, 2011. Defs.' Ex. T, ECF No. 23-20. Plaintiff's January 9, 2012 EEOC complaint did not make any mention of other prior acts of retaliation. The Court thus agrees that the only retaliation claim Plaintiff exhausted relates to the incident described in her January 9, 2012 EEOC complaint. *Cf. Eisenhour*, 744 F.3d at 1227 ("Because Ms. Eisenhour did not file a new EEOC claim or amend her submission to add the new incidents, the Title VII claim was unexhausted."); *Belcher v. Boeing Commercial Airplane Group*, 105 Fed. Appx. 222, 227 (10th Cir.2004) (holding that plaintiff's retaliation claim was not administratively exhausted where on administrative complaint he left box for retaliation blank and narrative portion of charge did not suggest retaliation). The Court will therefore confine its analysis of the merits of Plaintiff's Title VII retaliation claim to the charge she administratively exhausted.

Defendants contend that the December 22, 2011 letter of instruction does not amount to an adverse employment action because it was never executed or issued. They also argue that Plaintiff cannot meet the third element of a retaliation claim because she has no evidence that Mr. Muniz, who presented her with the letter of instruction, knew of the NAACP lawsuit. The Court agrees that, for the reasons given *supra* in its analysis of Count I, the letter of instruction does not amount to an adverse action where it was never placed in her personnel file. Mr. Muniz

gave Plaintiff the letter to get her response to CreditWatch's complaints against her, but the City never made the letter a part of her permanent record. Where nothing resulted from the initial inquiry, the December 22, 2011 letter does not amount to an action that would have dissuaded a reasonable worker from making or supporting a charge of discrimination.

Moreover, Plaintiff has not shown the requisite causal connection necessary to make a prima facie retaliation claim. To satisfy the third element, a plaintiff must demonstrate that the person who took the adverse action against her knew of the employee's protected activity, or that the person allegedly harboring the discriminatory animus knew and used the person who effected the adverse action as the "cat's paw" to affect her own discriminatory designs. *Montes*, 497 F.3d at 1176. Plaintiff has not presented evidence showing that Mr. Muniz knew about the NAACP lawsuit or that he knew that Ms. Allen was a party to the lawsuit. Nor has Plaintiff shown evidence to support a "cat's paw" theory.

Finally, Defendants have presented a legitimate non-discriminatory reason for Mr. Muniz giving the letter to Plaintiff – to investigate complaints of unprofessional behavior in a phone call made against her by a City vendor. Plaintiff has not provided evidence to rebut the City's reason for drafting the letter and presenting it to her or that would suggest that the City's proffered reason for presenting the letter to Plaintiff is unworthy of credence. For all the foregoing reasons, the Court will grant Defendants summary judgment on Plaintiff's Title VII retaliation claim.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (**ECF No. 22**) is **GRANTED** and this case is **DISMISSED WITH PREJUDICE**.[9]

_____
**UNITED STATES DISTRICT JUDGE**

---

[9] Plaintiff makes a passing remark that she is entitled to summary judgment. Pl.'s Resp. 10, ECF No. 32. In light of this Court's ruling on Defendants' motion, the Court denies Plaintiff's request for summary judgment in her favor.